**UNITED STATES of America**

**v.**

**Nathan WOLFSON et al., Appellant.**

**Appeal of William F. EMMONS, Appellant in No. 71–1365.**

**Nos. 71–1364, 71–1365.**

United States Court of Appeals, Third Circuit.

Argued Nov. 11, 1971.

Decided Jan. 20, 1972.

See also D. C., 52 F.R.D. 170.

Donald C. Taylor, Cooch & Taylor, Wilmington, Del., for appellant in No. 71–1364.

William D. Bailey, Jr., Bayard, Brill & Handelman, Wilmington, Del., for appellant in No. 71–1365.

F. L. Peter Stone, Asst. U. S. Atty., Wilmington, Del., for appellee.

Before VAN DUSEN and JAMES ROSEN, Circuit Judges, and BECKER, District Judge.

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

This case comes to this court on appeal from the criminal convictions of Nathan Wolfson and William F. Emmons in the District Court for the District of Delaware. Wolfson and Emmons were indicted on June 7, 1968, and charged under 18 U.S.C. § 371 with a conspiracy to violate the mail fraud statute, 18 U.S.C. § 1341, and with 28 additional substantive violations of the mail fraud statute.[1] Count 1 of the indictment charged that the defendants conspired to use the mails in furtherance of a scheme to defraud Agents General Insurance Company, Ltd. ("Agents General"), various insurance agents, and those whom the defendants induced to purchase insurance from Agents General. Counts 2 through 29 of the indictment charged that in furtherance of this scheme, the defendants either placed in the mails or received through the mails certain correspondence relating to the scheme outlined in Count 1. A jury trial lasting 12 days was held between November 3, 1969, and November 25, 1969.[2] At the close of the Government's evidence, the district court granted the defendants' motions for acquittal as to six counts of the indictment, but denied the motions as to the remaining counts.[3]

---

1. Three others were also indicted by the grand jury in connection with the fraudulent scheme alleged in the indictment. One of these three pleaded nolo contendere prior to trial. The other two were tried along with Wolfson and Emmons, but their motions for judgment of acquittal were granted at the close of the Government's case. See United States v. Wolfson, 322 F.Supp. 798, 804, 805 (D.Del. 1971).

2. Wolfson and Emmons were represented both at their trial and in this appeal by individual court-appointed counsel, who have vigorously represented their clients' interests.

3. Three counts relating only to one of the defendants who was acquitted at the close of the Government's evidence were also stricken at this point in the trial. See 322 F.Supp. at 805.

On November 25, 1969, the jury found Wolfson and Emmons guilty on all the remaining counts. On February 3, 1971, the district court granted the defendants' Rule 29(c) motions for judgment of acquittal as to five of the counts, but denied these motions as to the remaining counts. United States v. Wolfson, 322 F.Supp. 798 (D.Del.1971). Defense motions for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure were also denied. *Id.*

On appeal, attorneys for Wolfson and Emmons have strenuously argued that the district court erred in denying defense motions for a judgment of acquittal as to all counts of the indictment or, in the alternative, the motions for a new trial. Counsel allege the following errors:

1. The Government's failure to inform the defendants that Mr. S. J. Sexton of Toronto, Canada, was present in Wilmington, Delaware, during the course of the trial constituted a denial of the defendants' rights guaranteed by the Fifth and Sixth Amendments to the Constitution (see 322 F.Supp. 818–822).

2. The district court's failure to adequately instruct the jury on Canadian insurance law was prejudicial error (322 F.Supp. 828–830).

3. The district court's refusal to grant defense motions for severance (322 F.Supp. 816–817) and for free daily transcripts[4] (322 F.Supp. 818) denied defendants the benefit of a fair trial.

4. Defendants were denied a fair trial by means of the Government's failure to adhere to a pre-trial agreement relative to Jencks Act material (322 F.Supp. 817–818) and its improper closing remarks to the jury (322 F.Supp. 824–828).

5. The Government did not present competent evidence at the trial which would link Wolfson and Emmons directly with the mail fraud violations alleged in the indictment and developed by the Government's evidence at trial.

6. Numerous errors in the admission of incompetent and prejudicial testimony made a fair trial impossible (see, *e. g.*, 322 F.Supp. 822–824).

After an exhaustive review of the record and a thorough reading of the extensive briefs filed by counsel, we find the arguments advanced on behalf of Wolfson and Emmons to be without merit. The first four alleged errors outlined above are adequately dealt with in the lengthy and comprehensive opinion of the district court, to whom they were first addressed. See United States v. Wolfson, 322 F.Supp. 798 (D.Del. 1971). Thus, we find it necessary to refer only to the last two arguments mentioned above.

First, Wolfson and Emmons have argued that the Government has not established a fundamental element of the charges contained in the indictment, specifically that Wolfson and Emmons are criminally responsible for the actions and inactions of Canadian and British Insurance Managers, Ltd. ("Canadian and British, Ltd."). Basically the Government attempted to prove (1) that the defendants had induced Agents General —a Canadian insurance company—to enter into an agency agreement authorizing Canadian and British, Ltd.—a Bahamian Company—to act as its United States agent, (2) that the defendants made use of Canadian and British, Ltd. and other companies, particularly Excess Insurance Corporation of America ("Excess"), in order to induce various insurance agents in the United States to place insurance with Agents General and (3) that the companies controlled by the defendants fraudulently failed to report to Agents General insurance which they had written and, in fact, submitted to Agents General information and reports which were knowingly false. In addi-

---

4. *Cf.* Britt v. North Carolina, 404 U.S. 226, 92 S.Ct. 431, 30 L.Ed.2d 400 (Opinion of Dec. 31, 1971).

tion, the Government sought to establish that, as a part of this fraudulent scheme, the defendants wrote insurance in the United States both before Agents General had received approval from the Superintendent of Insurance for the Province of Ontario and after they (the defendants) had received notice that the Ontario Insurance Superintendent had restricted Agents General's license to forbid the insuring of risks outside of Ontario. It was also alleged that the defendants wrote insurance for Agents General for risks which the company was not authorized to accept and in amounts in excess of the company's authorized liability limits.[5]

Counsel for Wolfson and Emmons argue that even if the fraud alleged by the Government has occurred, there is no substantial evidence that Wolfson and Emmons are responsible for it. This argument is bottomed in two agreements introduced in evidence by the Government. The first is GX–1, an Agents Contract entered into on December 6, 1965, between Agents General and Canadian and British, Ltd., which authorizes the latter to write insurance for Agents General and also to sub-delegate its authority under the contract to "Sub-Agents." The second is GX–5, a Correspondents' Contract between Canadian and British, Ltd. and Excess dated December 15, 1965, in which Excess is authorized to act as the "correspondent" of Canadian and British, Ltd. in the writing of insurance for Agents General. Both agreements were signed on behalf of Canadian and British, Ltd. by persons other than Wolfson and Emmons. Thus, Wolfson and Emmons argue that even if they controlled Excess (which they concede), what wrongdoing has occurred is the responsibility of those in control of Canadian and British, Ltd. and that there is no evidence that they exercise such control.

This argument, advanced by counsel for Wolfson and Emmons, is adequately refuted by the trial record. This record indicates numerous instances in which both Wolfson and Emmons actively participated in and directed the affairs of Canadian and British, Ltd., so that there was clearly an adequate basis for the jury's implicit finding that Wolfson and Emmons were responsible for the fraudulent activities conducted in the company's name.[6] There was also

---

5. The indictment had also alleged that the fraudulent conspiracy included a failure to pay or settle claims arising under insurance policies sold by the defendants. The district court, however, found that the Government had failed to prove this allegation. See 322 F.Supp. at 810.

6. The testimony of the Government's first witness, Mr. George Arthur Cooper, the Managing Director of Agents General, reveals very clearly the control exercised by Wolfson and Emmons over the activities of Canadian and British, Ltd. Cooper testified that he first discussed the possibilities of an Agents Contract with Wolfson, who told him that Excess would be the principal on his side of the arrangement (N. T. 86–88). At a meeting held in late October 1965, however, Wolfson stated that Canadian and British, Ltd. would be substituted for Excess, ostensibly for tax purposes (N. T. 91). Agents General did not object, Cooper declared, "as the principals were supposed to be the same" (id.). At this same meeting, at which Emmons was present and actively participated, Wolfson signed two preliminary agreements on behalf of Canadian and British, Ltd. (N. T. 92–95, GX–2, GX–3). Cooper further testified that at least Wolfson participated in a closing meeting held in Toronto on December 6, 1965, and that both Wolfson and Emmons represented Canadian and British, Ltd. at a meeting that Cooper attended December 15, 1965, in Wilmington, Delaware, and again at a Toronto meeting on January 14, 1966, at which a final agency agreement between Agents General and Canadian and British, Ltd. was signed by Agents General (N. T. 96, 98–99, 100, 102). Cooper also testified that he had many phone conversations with Wolfson during March 1966 regarding matters affecting the Agents Contract (N. T. 126, 151), that Wolfson gave Agents General a power of attorney to act on behalf of Canadian and British, Ltd. in the drafting of a new agency contract "in accordance with the [Ontario] Department [of Insurance] regulations" (N. T. 156–57), and that Wolfson represented Canadian and British, Ltd. at an April 14, 1966, meeting with the Superin-

evidence from which the jury could reasonably conclude that (1) Wolfson and Emmons knew that the Ontario Insurance Commissioner had restricted Agents General from insuring risks outside of Canada after April 14, 1966,[7] and (2) these defendants sold Agents General policies after this date [8] (see, e.

tendent of Insurance of Ontario, at which Wolfson refused to disclose the principals of the company to the Superintendent (N. T. 160–62). Finally, Cooper testified that on September 20, 1966, after Agents General had been notified that it would be "closed down" by the Superintendent of Insurance, Emmons and two men identified only as "Al" and "Frank" came into his office and threatened his life unless they received a check for $50.-000. (N. T. 289–90).

The testimony of other witnesses also supports a finding that Wolfson and Emmons exercised control over Canadian and British, Ltd. For example, Thomas Thorett Meredith, a general insurance agent, testified that Wolfson and Emmons purported to act for Canadian and British, Ltd. (N. T. 318, 366) and that when he agreed on November 25, 1965, to reinsure some 200 policies with Agents General, he gave to Emmons—at the latter's request—a check for the premiums payable to Canadian and British, Ltd. (N. T. 319–21). (It is significant that Meredith's dealings with Wolfson and Emmons in connection with this reinsurance occurred *before* the Correspondents' Contract between Canadian and British, Ltd. and Excess was executed on December 6, 1965.) Theodore Clutz, an insurance broker who dealt with Wolfson and Emmons through several companies, testified that after discussions with Wolfson and Emmons he was given authority by Canadian and British, Ltd. to bind Agents General (N. T. 766–76) and that at the request of Wolfson and Emmons he sent checks payable to Canadian and British, Ltd. to their offices at 2008½ Pennsylvania Ave., Wilmington, Delaware (N. T. 780, 785). Mr. Arthur Benjamin Taylor, another insurance broker from Houston, Texas, also testified that Wolfson led him to believe that he was an official of Canadian and British, Ltd. and declared that it was Wolfson who gave him authority to write insurance binding Agents General (N. T. 428–30). Further, Mrs. Katherine Louisa Wells Mears, who was employed as a secretary at the offices of Excess at 2008½ Pennsylvania Ave., Wilmington, Delaware, testified that she typed on the letterhead of Canadian and British, Ltd. in the period December 1965 to February 1966 (N. T. 999–1000). Finally, even Mr. Gaines, the lone defense witness, testified that Wolfson re-

tained him to attend the April 14, 1966, meeting with the Superintendent of Insurance on behalf of Canadian and British, Ltd. (N. T. 1342–43).

7. Cooper testified that Wolfson was present representing Canadian and British, Ltd. at the meeting with the Superintendent of Insurance in Toronto on April 14, 1966 (N. T. 160). After Wolfson refused to disclose the principals of Canadian and British, Ltd., the Superintendent declared, in Wolfson's presence, that he would restrict the writings of Agents General to Ontario (N. T. 161–62). The next day Agents General sent a registered letter to Canadian and British, Ltd., with a copy to Wolfson, declaring that Agents General and hence Canadian and British, Ltd. had no authority to write business outside of Ontario (N. T. 163–64, GX–14). Enclosed in this letter was a copy of a letter to Agents General purportedly from the Deputy Attorney General of Ontario, in which the restriction was also set forth (N. T. 163–68, GX–15). Cooper further testified that shortly thereafter a meeting of the Directors of Agents General was convened at Wolfson's request to discuss ways and means of taking Canadian and British, Ltd. out of Agents General (N. T. 168–69). Wolfson and Emmons were both present at this meeting, at which Emmons actively participated (*id.*).

8. Cooper testified that in May 1966 the Ontario Insurance Superintendent notified Agents General that its license would not be renewed in June 1966 (N. T. 170). He further testified that Agents General was permitted to write renewals of Ontario policies until August 1966, when Agents General was told that its license would not be renewed after September 30, 1966, and that immediate arrangements for reinsuring the complete portfolio must be made (N. T. 170–71). Cooper also testified that he had contacts with Wolfson and Emmons after April 14, 1966, in an attempt to resolve the problems between Agents General and Canadian and British, Ltd. (N. T. 270–71, 289).

Notwithstanding the notice to Wolfson and Emmons of at least the restriction placed on Agents General's license by the Ontario Insurance Superintendent, there was uncontradicted testimony that they continued to write or authorize the writing of insurance for Agents General after

g., 322 F.Supp. 810). Finally, there was evidence to support a jury finding that Wolfson and Emmons, having notice that Agents General was in extreme difficulty with the Ontario Insurance Commissioner, continued to write or authorize the writing of insurance in Agents General's name without revealing these difficulties to the agents with whom they dealt.[8] In sum, there is substantial evidence that Wolfson and Emmons were not merely sub-agents of Canadian and British, Ldt., but were instead prime movers of a fraudulent scheme conducted under its aegis.

Counsel for Wolfson and Emmons also argue that numerous errors in the admission of evidence require that a new trial be ordered. We have carefully examined all of the errors alleged both in the briefs submitted by counsel (especially pp. 45–58 of appellants' brief) and at oral argument and find that none of them furnish a basis for a new trial. Also, we have considered and rejected the other contentions of the defendants.

Accordingly, the judgments of conviction entered against Wolfson and Emmons by the district court will be affirmed.

---

April 14, 1966. For example, Theodore Clutz testified that he continued to write insurance with Agents General under the authority given him by Wolfson through the early part of December 1966, when Wolfson and Emmons told him to stop (N. T. 736). Taylor, another insurance broker, also testified that he continued to deal with Wolfson and write policies with Agents General through May 1966, when he (Taylor) stopped paying premiums (N. T. 474–77, 489). Another insurance agent, Gene Smyers, testified that he negotiated reinsurance with Agents General through Wolfson and Canadian British, Ltd. on June 23, 1966 (N. T. 679–82). Finally, Peter G. Hansen, an insurance agent from Hurst, Texas, testified that he wrote Agents General policies with Excess until at least June 1966, when he first talked with Agents General and was informed that Wolfson did not have a binding contract with them (N. T. 1062–67).

Wolfson's and Emmons' defense that they believed that the Ontario Insurance Superintendent had no authority to regulate the activities of Agents General outside of Ontario is undercut by their previous efforts to secure the approval of the Superintendent. Thus, Cooper testified that after the agency arrangement with Agents General was signed on January 14, 1966, Wolfson and the President of Agents General went to the Ontario Department of Insurance to get permission for the business to be written in the United States by Canadian and British, Ltd., and that, since by letter of January

25, 1966, the Superintendent of Insurance restricted this permission to several parts of the country, Wolfson later dictated a letter to the Department of Insurance requesting permission to write insurance in other areas of the United States. Also Cooper testified that he sent a letter to Emmons dated January 28, 1966, in which he enclosed two copies of the January 25, 1966, letter from the Insurance Superintendent, one of which was used by Wolfson in dictating his request for an extension of territory. (N. T. 100–01, 108, 113–23, GX–6, GX–7, GX–8, GX–9). The defense is further undercut by the defendants' efforts to conceal from Agents General the insurance that they had written. For example, Emmons told Cooper at a meeting held after April 14, 1966, that their companies had not written any business prior to January 14, 1966, and had written only "peanuts" since then (N. T. 108–09, 169), whereas the testimony, including that outlined above, indicates that in fact companies directed by Wolfson and Emmons had written substantial business in both these periods. Finally, even Gaines, the lawyer upon whose advice defendants claim they relied in continuing to write insurance, testified that he told them that they "could continue to write insurance so long as Agents General had the power and the authority under their charter to write insurance" (N. T. 1342), whereas Cooper's testimony indicates that Agents General did not even have this authority after September 1966 (N. T. 170–71).