No. 84-408

IN THE SUPREME COURT OF THE STATE OF MONTANA

1985

_____

STATE OF MONTANA,

          Plaintiff and Respondent,

   -vs-

EDDIE TWOTEETH, JR.,
A Youth under the age of 18 years,

          Defendant and Appellant.

_____

APPEAL FROM: District Court of the Ninth Judicial District,
            In and for the County of Glacier,
            The Honorable R. D. McPhillips, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        James W. Zion, Helena, Montana

    For Respondent:

        Hon. Mike Greely, Attorney General, Helena, Montana
        James C. Nelsen, Glacier County Attorney, Cut Bank,
        Montana

_____

Submitted on Briefs: Sept. 26, 1985

Decided: December 18, 1985

Filed: DEC 1 8 1985

Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

Appellant, Edward Gerald Twoteeth, a minor, appeals from the order of the District Court, Ninth Judicial District, County of Glacier, sitting as a Youth Court, finding him to be a delinquent youth pursuant to section 41-5-521(6), MCA, and ordering that a predispositional report be made concerning Edward and that a dispositional hearing be held. We affirm.

On February 14, 1984, Edward and two women, Faith Buffalo and Lucy Potts, along with other unnamed minor children of either Buffalo or Potts, attempted to cross the United States/Canadian border. Their van was turned back from the border at Sweetgrass, Montana. As a result, the appellant, Buffalo and Potts proceeded to the Glocca Morra Bar in Sweetgrass, Montana, at about 10:00 p.m.

The appellant, Buffalo and Potts met and conversed with two men, Covel Hulse and Tom Wallace, in the bar. Hulse was employed by Simmons Drilling Company as the tool pusher for Simmons Oil Drilling Rig #31. For all intents and purposes, Hulse was the foreman at this particular rig. Wallace was employed by a trucking company to haul water to Rig #31. Buffalo and Potts explained to the two men that they were low on money and gasoline and could not cross the border until 11:00 a.m. the next day when the appellant's father or some third person would be bringing the necessary papers to enable them to cross the border. (It was never substantiated that Edward's father was ever bringing papers to the border.) After hearing this, the adult members of the group each consumed three or four beers at the bar, the appellant drank

only Pepsi, and then Hulse invited the women and the appellant out to the rig site for chili, gasoline and a place to spend the night.

The Simmons Drilling Company Rig #31 was located approximately 20 miles west of Sweetgrass, Montana, or 25 miles north of Cut Bank, Montana. The drilling site was in Glacier County, Montana, on the Tuffy Swenson farm. The site is located in remote farm country with only one farmhouse nearby.

Hulse, Wallace, and the appellant proceeded to the rig site in a pickup while Buffalo, Potts and the children followed in the van.

The two vehicles arrived at the rig site at approximately 1:30 a.m. Hulse, Wallace, Buffalo, Potts and the appellant immediately entered Hulse's small camping trailer at the rig site. They all ate chili and bread. The bread was sliced with a butcher knife purchased by Hulse three days earlier. During the meal, the appellant picked the butcher knife up from the table and pretended to shave with it; drew the blade across each of his cheeks and smiled. The knife was taken away from the appellant by Potts and put into a drawer in the trailer. Apparently the knife was placed in the drawer in full view of all those in the trailer. After the meal, Edward and Wallace fell asleep in the trailer.

Also present at the rig site at this time were four other workers: The decedent George Feek, Craig Brown, Ray Firman and Cody James.

At some point Buffalo and Potts requested a tour of the rig site. Around 2:30 a.m., the tour commenced. The tour was conducted by Brown and James. The tour included a look

inside the boiler room. When the women, Brown and James arrived in the boiler room, Feek was scrubbing the ceiling. As the five people were standing in the boiler room, the appellant walked by. As he did, Brown invited him in to warm up. The appellant was wearing a light shirt and, when in the boiler room, stood with his arms crossed in front of him at belt level, as though he were cold. No one noticed anything peculiar about the youth except for the fact he was dressed in a t-shirt and it was cold. No one saw the appellant holding a knife or other weapon.

James and Buffalo then left the boiler room, as James had to "catch another sample." En route to the rig, Buffalo went to the van where one of her children was standing and crying. The appellant, Potts, Brown and Feek were in the boiler room when James and Buffalo left. Very soon thereafter, everyone left the boiler room except the appellant and Feek.

On his way back from catching a sample, James stopped by the boiler room to see if the rest of the group was still there. From the doorway he saw no one was in the boiler room but Feek and the appellant. Feek was scrubbing the ceiling of the room, with his back to the appellant. James never heard any conversation between Feek and the appellant.

James then met Hulse, Brown and Potts by the rig. Shortly thereafter, Buffalo returned from the van. At approximately the same time, Feek stumbled up to the group with the butcher knife in his left hand, saying "she stabbed me, she stabbed me."

As the group gathered by the rig, Firman, who had been working on the rig, walked out to where he could see the area and the people standing below. After viewing the group

approximately 30 seconds, Firman saw George Feek come out of the boiler room and stagger to the group with the knife in his hand. Firman saw no one other than Feek come out of the boiler room.

Brown testified that had Buffalo gone to the boiler room in the amount of time she was separated from the group which was testified to be approximately 15 minutes, he would probably have seen her. Further, James testified that he would have met Buffalo had she gone to the boiler room after she had gone to the van to see her child.

Feek was stabbed in the back below the left shoulder. The wound was 3.5 centimeters long and 10 centimeters deep. The knife had been plunged into the lung and had severed the major branches of the pulmonary artery. After Feek came out of the boiler room and collapsed, he was taken to the trailer where Tom Wallace was still sleeping. Eventually he was placed in the women's van and taken to meet an ambulance. He was pronounced dead on arrival at the hospital in Cut Bank.

A search of the area for the appellant by the workers after the incident was fruitless. The sheriff and deputy sheriff who arrived at the site at approximately 5:40 a.m. also could not find the appellant.

After searching the surrounding area in a pickup truck, the sheriff and a deputy pulled up alongside the women's van, which was again parked at the site. Potts was sitting in the van and told the sheriff and deputy that the appellant was in the van. The officers found the appellant apparently hiding in a small cabinet in the van which measured approximately 18" x 18" x 30."

The appellant was then put in the deputy sheriff's pickup truck. During the ride to the sheriff's office, in

response to the deputy's question as to whether something was wrong with him, the appellant stated: "I don't know, I guess I was drunk."

After Feek's death, a delinquency petition was filed seeking the adjudication of the appellant as a delinquent youth for the commission of a deliberate homicide. On August 9, 1984, the District Court, sitting as a Youth Court and without a jury, found the appellant to be a delinquent youth for the commission of a deliberate homicide. Following a dispositional hearing held September 7, 1984, the District Court ordered that appellant be placed in the custody of the Department of Institutions until he reaches 21 years of age.

Appellant raises seven issues on appeal:

1. Given the exculpatory evidence, factors, inferences and presumptions which are contained in the record:

a. Was the contested offense supported by proof beyond a reasonable doubt as required by section 41-5-521(2), MCA;

b. Is there reasonable doubt to find the appellant is a "delinquent youth" as defined in section 41-5-103(12), MCA; and

c. Was the presumption of innocence which operated to the point of adjudication overcome?

2. Whether there was any rational theory of the act of another causing the homicide or rational theory of the youth's innocence which could cause the circumstantial evidence in this case to be inconsistent with a theory of guilt?

3. Whether the findings and statements of the Youth Court were such as to show the adjudication of delinquency was founded only upon a "justifiable suspicion, a strong

probability or a shrewd conjecture" such as to void the finding of delinquency?

4. Whether improper evidence, inconsistency or clear witness advocacy defeats the circumstantial case or gives rise to a reasonable doubt?

5. Given all the facts and matters in this case, which has been described by the Youth Court as "bizarre" and "inexplicable" was there substantial evidence to support the adjudication of the youth as delinquent for having committed an intentional homicide?

6. Whether the failure of the State to either secure the presence at the hearing of two material witnesses or to obtain their testimony by adversarial process before they fled to Canada either denied the youth his right to process which would effectively compel the attendance of those witnesses or whether that failure raises an exculpatory presumption in his favor?

7. Whether the dispositional hearing conducted under section 41-5-522, MCA (a) provided the youth a sufficient opportunity to present alternatives for disposition, (b) adequately safeguarded the youth's needs by providing a dispositional alternative to return to the Pine Hills School at Miles City, or (c) was in the best interest of the youth and the public?

For purposes of our review, the first five issues raised by the appellant may be consolidated into one: whether the Youth Court properly found appellant to be a delinquent youth.

Section 41-5-103(12)(a) defines a delinquent youth as a youth "who has committed an offense which, if committed by an adult, would constitute a criminal offense." The offense the

- 7 -

appellant was accused of committing was deliberate homicide. If a deliberate homicide is committed by an adult it constitutes a criminal offense. Therefore, if the Youth Court properly found the appellant to have committed a deliberate homicide based upon the circumstantial evidence presented by the State, it acted properly in finding appellant a delinquent youth.

There is no dispute that the State's entire case rested upon circumstantial evidence. The crux of the appellant's contention, however, is that the circumstantial evidence presented by the State was insufficient for the court to find that he committed a deliberate homicide. The State contends that the State did meet its burden of proof by presenting substantial evidence to support the Youth Court's conclusion that the appellant was a delinquent youth.

Section 41-5-521(2) provides in part:

> An adjudicatory hearing shall be held to determine whether the contested offenses are supported by proof beyond a reasonable doubt in cases involving a youth alleged to be delinquent.. . . If the hearing is before the youth court judge without a jury, the judge shall make and record his findings on all issues.

In contending that the State did not meet its burden of proof and that the Youth Court's findings of fact and conclusions of law were not supported by the evidence, the appellant directs this Court to its rule regarding obtaining a conviction based only upon circumstantial evidence. Although this case does not involve a criminal trial, we find the rule applicable because of the State's high burden of proof. We, however, also find that the application of this rule to the present case leads to the affirmance of the Youth Court's order finding the appellant a delinquent youth.

The rule to which the appellant refers states that when a conviction is sought solely on circumstantial evidence, the facts and circumstances must not only be entirely consistent with the theory of guilt but must be inconsistent with any other rational theory. State v. Starr (Mont. 1983), 664 P.2d 893, 896, 40 St.Rep. 796, 798; State v. Stoddard (1966), 147 Mont. 402, 408, 412 P.2d 827, 831. Any determination of circumstantial evidence which may be sufficient to sustain a conviction must be made considering all the facts and circumstances of the case, considered collectively. State v. Armstrong (Mont. 1980), 616 P.2d 341, 346, 37 St.Rep. 1563, 1567. But it is also the rule that each fact in the chain of circumstances need not be proven beyond a reasonable doubt. Rather, the State must prove that there is not a reasonable doubt arising from consideration of all the evidence in the case. State v. Fitzpatrick (1973), 163 Mont. 220, 226, 516 P.2d 605, 609.

We hold, after considering the entire record that the State met its burden of proof and that there is substantial evidence in the record to uphold the Youth Court's order finding appellant a delinquent youth for having committed a deliberate homicide.

A person commits the offense of deliberate homicide if he purposely or knowingly causes the death of another human being. Sections 45-5-101 to -102, MCA. Thus, we must review the record to determine whether there is substantial circumstantial evidence to support the Youth Court's finding that the appellant committed the contested offense, deliberate homicide.

The record reveals that the oil rig was located in a desolate and isolated farming area. There were no other

people at the rig site other than the appellant, Buffalo, Potts, Hulse, Firman, Brown, Wallace, James, the deceased George Feek and minor children who were sleeping in the van. Each of the above-named people, except the appellant, accounted for themselves and pinpointed their own location on the rig at the time of the stabbing of George Feek. This accounting was either through their own testimony, substantially corroborated, or the testimony of others. Immediately following the collapse of Feek at the stairs to the rig, each person on the rig site is accounted for except the appellant.

The appellant was left in the trailer where the weapon was located when the group moved to the rig for a tour. He joined the group in the boiler room sometime later, after he had first walked past the boiler room door. He then entered the boiler room with his arms crossed at his waist. Witnesses testified he could have had his arms crossed to hide the weapon in his pants or he may have been cold due to wearing only a t-shirt in the 15-20° Fahrenheit temperature that night.

When the group disbursed and moved on to the stairs of the rig, the appellant remained behind in the boiler room. The appellant was last seen in the boiler room with Feek by James. James testified that the appellant and Feek were in the boiler room and that Feek was working with his back to the appellant. Minutes later, Feek came stumbling out of the boiler room and said, "She stabbed me! She stabbed me!"

With regard to Feek's statement the evidence indicated the appellant had long hair down to the small of his back pulled into a pony tail. The appellant also has a small frame standing approximately 5'5" tall in height. Two

witnesses testified that at first sight, they thought the appellant was a female. The Youth Court also noted that the appellant bore no outwardly visible signs, such as a mustache, beard, tatoos or jewelry that would provide a reasonable person with a clue to the appellant's gender.

The Youth Court obviously inferred that Feek was mistaken about the appellant's gender when he made the statement. Based on the evidence presented, it was proper for the Youth Court to do so. Sections 26-1-501 to -502, MCA.

Immediately following the collapse of Feek, the appellant could not be located anywhere upon the rig site. At approximately 5:40 a.m., the deputy sheriff could not locate the appellant anywhere on the rig site or the surrounding farm country. At 7:50 a.m., the law enforcement officers were told by Potts that the appellant was hiding inside the van. The appellant was found hidden in a small cabinet approximately 30" tall, 18" wide, and 18" deep. The officer expressed astonishment that anyone could hide in such a small cabinet.

It is well settled that the flight or concealment of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by the trier of fact in light of all other provided facts in deciding the question of his guilt or innocence. Whether or not evidence of flight or concealment shows a consciousness of guilt, and the significance, if any, to be attached to such a circumstance, are matters for determination by the trier of fact. State v. Pierce (1982), 199 Mont. 57, 63, 647 P.2d 847, 851; State v.

Hardy (1980), 185 Mont. 130, 136, 604 P.2d 792, 796; State v. Gone (1978), 179 Mont. 271, 277, 587 P.2d 1291, 1295.

Again, considering all the circumstantial evidence collectively, we find that the State met its burden and the court properly found the appellant to be a delinquent youth for having committed the contested offense, deliberate homicide.

The second issue raised by the appellant is whether his right to compulsory process was affected by the failure of Buffalo and Potts to testify at the adjudicatory hearing. The appellant contends that the two women, both of whom were Canadian citizens, should have been required to testify at the adjudicatory hearing. The appellant claims that their failure to appear was a violation of his right to have process to compel witnesses to appear, for which the State was responsible, despite the fact the State had the women served with subpoenas by the Royal Canadian Mounted Police.

It is true that in all criminal prosecutions the accused has the right to process to compel the attendance of witnesses. U.S. Const. amend VI; 1972 Mont. Const., Art. II, § 24. The Youth Court Act, however, expressly states that an adjudication under the act shall not be deemed a criminal conviction. Section 41-5-106, MCA. Thus, the question seems to arise whether a youth involved in a delinquency adjudication is even entitled to this constitutional right. We, however, find it unnecessary to reach the constitutional issue in the instant case because the women were not United States citizens and could not be legally compelled to appear. Where an American court lacks the power to compel a witness who is not an American citizen to appear, a defendant's right to compulsory process is not violated by the absence of the

- 12 -

witness. United States v. Wolfson (1971), 322 F.Supp. 798, 820-22, aff'd, 454 F.2d 60 (3d Cir. 1972), cert. denied, 406 U.S. 924 (1972); United States v. Greco (2d Cir. 1962), 298 F.2d 247, 251, cert. denied, 369 U.S. 820 (1962).

In this case, the witnesses were outside the jurisdictional limits of the Youth Court and could not be compelled to appear. Therefore, though we do not pass on the constitutional question, the appellant's right was not affected.

The final issue raised by the appellant is whether the Youth Court acted properly by allowing for the automatic transfer of the appellant from the Griffith Center in Colorado to the Department of Institutions without a prior hearing. The appellant apparently contends that the Youth Court's dispositional order was in contravention of section 41-5-522(4), MCA, which requires the court to make a "disposition of the case best serving the interests of the youth and the public."

On November 20, 1984, the Youth Court held a dispositional hearing. The dispositional order directed that temporary custody of the appellant be placed in the Department of Social and Rehabilitation Services with instructions that the appellant be placed in the Griffith Center Program in Colorado. The District Court further ordered:

> That upon completion of the Griffith Center Program by the Youth his custody shall automatically revert to the Montana State Department of Institutions. The Youth shall at that time be granted the right to file an additional petition requesting an alternate placement of the Youth in some program other than at Pine Hills as appropriate.

During the hearing, the appellant objected to the automatic transfer of custody to the Department of Institutions on the

appellant's completion of the Griffith Center program and, in that regard, requested the Court to hold another hearing at that time as to the further disposition of the appellant in view of certain placement opportunities available to him in Canada. The Youth Court denied the appellant's request.

The appellant now argues the order for automatic transfer to Pines Hills following treatment in Colorado was improper, contending that a hearing should be held before such a transfer. Appellant, however, fails to show how the Youth Court's order violated the court's power to determine what is in the best interests of the youth and public. Section 41-5-523, MCA, provides allowable dispositions and gives the Youth Court the authority to place the youth in the custody of the Department of Institutions and in a youth care facility. Given the court's power and the appellant's inability to show that the Youth Court's order was in violation of its power, we uphold the dispositional order of the Youth Court.

We affirm the Youth Court.

_____
John L. Sheehy
Justice

We Concur:

_____
Chief Justice

_____

_____

- 14 -

_____

William E. Hunter
Justices