LEON SPEAR AND JEANETTE SPEAR, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3276-87.     Filed December 6, 1988.

*Gordon F. Moore II* and *George J. Anderson,* for the petitioners.

*James C. Fee, Jr.,* for the respondent.

OPINION

WILLIAMS, *Judge:* This case is before us on petitioners' motion for partial summary judgment. The Commissioner determined deficiencies in petitioners' Federal income tax and additions to tax for fraud for the taxable years 1975, 1976, and 1977 as follows:

| Year | Deficiency | Sec. 6653(b)[1] addition to tax |
| --- | --- | --- |
| 1975 | $51,271.70 | $25,635.85 |
| 1976 | 157,706.46 | 78,853.23 |
| 1977 | 93,536.23 | 46,768.12 |

Petitioners Leon and Jeanette Spear are husband and wife who resided at Philadelphia, Pennsylvania, when they filed their petition in this case. During the years in issue, petitioners owned corporations that operated several parking lots in Philadelphia, Pennsylvania.

In 1975, 1976, and 1977, petitioners were the sole shareholders of Ezy Parks, Inc. (Ezy), which operated several parking lots in Philadelphia. In 1975, petitioners incorporated Ezy Parks, II, Inc. (Ezy II). Ezy II began business operations in 1976, and in 1976 and 1977 its principal activity was the operation of parking lots in Philadelphia. During 1976, Jeanette Spear and petitioners' two adult sons each owned one-third of the stock of Ezy II. During 1976 and 1977, Leon Spear owned all of the stock of Tumble Down, Inc. (Tumble Down), which operated parking lots in Philadelphia until 1976. Thereafter, Tumble Down was dormant.

In 1976, petitioners formed J. Faunce, Inc. (J. Faunce). Petitioners were the sole shareholders of J. Faunce in 1976 and 1977. J. Faunce began business operations during the fiscal year commencing May 1, 1977. Its principal business activity was the ownership of real estate in Philadelphia, which it leased to petitioners' corporations for use in their parking lot operations.

---

[1] All section references are to the Internal Revenue Code of 1954 as in effect during the years in issue.

During the years in issue, the City of Philadelphia (the city) imposed a 10-percent tax on all parking lot receipts. To ensure that gross receipts were properly accounted for (and thus to ensure that the proper amount of taxes would be paid), the city controlled the issuance of prenumbered parking tickets. When a patron drove onto a parking lot and paid the parking fee, the lot attendant handed him the top portion of a prenumbered ticket. The middle portion of the ticket was placed on the car windshield and the bottom portion turned over to the lot supervisor. The supervisor then reconciled the amount of gross receipts with the number of tickets used, and filed monthly parking lot returns with the city.

The city conducted periodic audits of monthly returns and made random, unannounced on-site inspections of parking lot operations. No discrepancies between reported and actual receipts were found during the years in issue for any of petitioners' parking lots.

Respondent's Criminal Investigation Division conducted an examination of petitioners' Federal income tax returns for the years 1975, 1976, and 1977. Special Agent Lawrence Treppel reconstructed petitioners' income using the net worth method. For the taxable year 1975, petitioners' adjusted gross income as stated on their return was substantially the same as Special Agent Treppel's findings and he thus discontinued the examination of that year. Treppel concluded, however, that petitioners had omitted $233,075.42 from gross income in 1976 and $137,944.52 in 1977.

Treppel's investigation resulted in the filing of a four-count indictment against petitioners in the U.S. District Court for the Eastern District of Pennsylvania (Criminal Case No. 82-00218). Counts I and II of the indictment charged that petitioners willfully and knowingly attempted to evade Federal income taxes due and owing for the taxable years 1976 and 1977 by filing false and fraudulent returns, violations of section 7201. Count III alleged that Leon Spear willfully and knowingly signed Ezy's 1976 corporation tax return knowing that the information therein was not true and correct, a violation of section 7206(1). Count IV alleged that Jeanette Spear aided and assisted in

the preparation of Ezy's 1976 return knowing that its gross receipts were understated, a violation of section 7206(2).

Petitioners were tried before Judge James T. Giles and a jury from January 4, 1983, through January 13, 1983. Counts III and IV of the indictment were dismissed during the trial. Special Agent Treppel testified at the criminal trial concerning his investigation of petitioners' income tax returns and the returns of the parking lot corporations for the years 1975, 1976, and 1977. The Government argued that petitioners had "skimmed" or otherwise misappropriated cash receipts generated by their parking lot operations. A primary basis for the Government's contention that the parking lots were the likely source of unreported income was that the parking lot returns filed with the city of Philadelphia showed more income than was reported on the Federal corporate income tax returns. The Government specifically attempted to prove for the taxable years 1976 and 1977 that (1) there were increases in petitioners' net worth, (2) such increases represented unreported income, (3) a likely source of the unreported income was the parking lot operations conducted by Ezy, Ezy II, and Tumble Down, and (4) petitioners willfully and fraudulently understated their income tax liability.

At the conclusion of the trial, the jury deliberated but failed to reach a verdict. On petitioners' motion, a mistrial was declared and the jury discharged. Petitioners then moved for a judgment of acquittal on Counts I and II pursuant to rule 29(c) of the Federal Rules of Criminal Procedure.[2]

In a bench opinion issued on March 21, 1983, Judge Giles concluded that based on the evidence presented, a jury could not find that guilt was established beyond a reasonable doubt and granted petitioners' motion for acquittal.[3] He first noted that the Government had the burden of

---

[2]Rule 29(c), Federal Rules of Criminal Procedure, provided:

(c) Motion After Discharge of Jury. If the jury returns a verdict of guilty or is discharged without having returned a verdict, a motion for judgment of acquittal may be made or renewed within 7 days after the jury is discharged or within such further time as the court may fix during the 7-day period. If a verdict of guilty is returned the court may on such motion set aside the verdict and enter judgment of acquittal. If no verdict is returned, the court may enter judgment of acquittal. It shall not be necessary to the making of such a motion that a similar motion has been made prior to the submission of the case to the jury.

[3]The bench opinion is reproduced as Appendix A, pp. 997-1001.

proving both an increase in petitioners' net worth during 1976 and 1977 and a likely source for the increase. In the alternative, the Government could have negated all possible nontaxable income sources. The Government also had to establish that any failure to report income was willful. He concluded that the Government was bound by its representation in the bill of particulars that the alleged net worth increases were attributable to the parking lots. The Government, therefore, was precluded from establishing other likely sources of income. The judge also found that the Government had not negated all nontaxable sources of funds.

Judge Giles recited the specific findings of fact on which he based his decision. The following facts were essential to his conclusion that petitioners were entitled to a judgment of acquittal and are relevant to this proceeding:

(1) Although the parking lot returns filed with the city showed more income than was reported on Ezy's Federal corporate income tax returns for 1976 and 1977, there is no evidence that petitioners' accountant violated any generally accepted accounting principles in arriving at the figures on the Federal income tax returns.

(2) Each of the parking lot tickets issued by the city is accounted for, and the city's periodic audits showed no variance. There is no evidence that the tickets were destroyed or otherwise unavailable.

(3) There is no reason to believe that either petitioner was skimming money from the parking lot operations.

(4) There is no evidence of any misappropriations of moneys by any employees of the parking lots charged with the duty of collecting moneys, nor is there any evidence that either petitioner asked any employee to misappropriate or conceal collections.

(5) A considerable amount of moneys went from the active parking lot corporations into J. Faunce, a holding company.

(6) The trail of money transferred to J. Faunce is clear and aboveboard, negating any possibility that a jury could find a willful attempt to hide such moneys.

After the criminal proceedings were concluded, respondent commenced a civil investigation of petitioners' income tax

returns for the years 1975, 1976, and 1977. On December 13, 1986, respondent mailed his notice of deficiency determining deficiencies in petitioners' income tax for 1975, 1976, and 1977 in excess of the amounts alleged in the indictment and additions to tax for fraud for each of those years. Petitioners timely filed their petition with this Court on February 6, 1987. On February 19, 1988, petitioners filed their motion for partial summary judgment. Respondent filed his objection to petitioners' motion on April 11, 1988, and petitioners filed a reply on May 12, 1988.

Summary judgment is appropriate if there is no genuine issue as to any material fact and if a decision may be rendered as a matter of law. A partial summary judgment may be entered which does not dispose of all issues in the case. Rule 121(b).[4]

Petitioners contend that the doctrine of collateral estoppel bars respondent from contesting the factual findings and conclusions of the U.S. District Court for the Eastern District of Pennsylvania. In addition, petitioners argue that respondent is estopped under the doctrine of judicial estoppel from asserting that petitioners had unreported income in 1975, 1976, and 1977 in excess of the amounts asserted in the criminal proceeding.

If respondent is estopped from contesting the District Court's findings and the Government's assertions in the criminal proceeding, petitioners argue that, as a matter of law, (1) there is no deficiency in income tax due from petitioners for the taxable year 1975, (2) there are no additions to tax due from petitioners for the years 1975, 1976, and 1977, and (3) because petitioners' returns were not false or fraudulent with intent to evade tax, the statute of limitations bars assessment and collection of any deficiency or addition to tax. If the statute of limitations is open, petitioners argue that respondent is bound by the amounts asserted in the indictment as deficiencies for the years 1976 and 1977.

Collateral estoppel applies in Federal tax cases. *Commissioner v. Sunnen*, 333 U.S. 591, 598 (1948). In addition, the doctrine applies former criminal convictions to later civil

[4]All Rule references are to the Tax Court Rules of Practice and Procedure unless otherwise noted.

proceedings. See *Local 167, International Brotherhood of Teamsters v. United States,* 291 U.S. 293, 298 (1934). Under the doctrine of collateral estoppel, a matter actually and necessarily determined by a court of competent jurisdiction is conclusive in a subsequent suit involving the same parties but a different cause of action. *Montana v. United States,* 440 U.S. 147, 153 (1979); *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326 n. 5 (1979). Thus, once a matter is actually and necessarily litigated and determined in a valid final judgment, that matter cannot be litigated again in any future suit between the parties or their privies. *Ashe v. Swenson,* 397 U.S. 436, 443 (1970); *Meier v. Commissioner,* 91 T.C. 273 (1988); *Peck v. Commissioner,* 90 T.C. 162, 165-166 (1988). The doctrine "preclude[s] parties from contesting matters that they have had a full and fair opportunity to litigate[,] protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions." *Montana v. United States,* 440 U.S. at 153-154.

In *Peck v. Commissioner,* 90 T.C. at 166-167, we summarized the conditions necessary for collateral estoppel to apply. First, the matter at issue in the second suit must be identical with the one decided in the first suit. *Commissioner v. Sunnen,* 333 U.S. at 599-600. Second, there must be a final judgment rendered by a court of competent jurisdiction. *Gammill v. Commissioner,* 62 T.C. 607, 613 (1974). Third, the parties to the second suit must be the same as the parties to the first judgment or in privity with them. *Gammill v. Commissioner,* 62 T.C. at 614, 615. Fourth, the parties must have actually litigated the matters at issue and the resolution of those matters must have been essential to the prior decision. *Commissioner v. Sunnen,* 333 U.S. at 598, 601. Finally, the controlling facts and legal principles must remain unchanged. *Commissioner v. Sunnen,* 333 U.S. at 599-600.

The first requirement for collateral estoppel is satisfied in this case. The factual issues in both the criminal and civil proceedings are identical. Counts III and IV of the indictment were dismissed at the criminal trial. Thus, the judge entered his decision only on the tax evasion charges

described in Counts I and II and section 7201. The Government relied on the net worth method to establish a violation of section 7201. To meet its burden of proof, the Government had to establish, beyond a reasonable doubt, (1) an increase in petitioners' net worth for the years in issue, (2) a likely source for the increase in net worth (or negate all nontaxable sources of funds), and (3) a willful failure to report income by petitioners with intent to evade tax. The Government did not have to establish the exact amount of understated income to establish criminal tax evasion. *United States v. Isaksson,* 744 F.2d 574, 578 (7th Cir. 1984).

To prove fraud under section 6653(b), respondent must establish, by clear and convincing evidence, that petitioners understated their income during the years in issue with specific intent to evade taxes they knew or believed they owed. *Stephenson v. Commissioner,* 79 T.C. 995, 1005 (1982), affd. 748 F.2d 331 (6th Cir. 1984); Rule 142(b). Respondent relied on the net worth method to determine the deficiencies in this proceeding as the Government did in the criminal proceeding. Thus, the matter at issue in both proceedings was a likely source of allegedly unreported income. In addition, in both proceedings the Government had to establish willfulness.

The second and third requirements for collateral estoppel have also been satisfied. The District Court judgment was not appealed and has become a final judgment, and the parties to both proceedings are the same. The fifth requirement, that the controlling facts and legal principles remain unchanged, is also met.

The fourth requirement for collateral estoppel is that the parties have actually litigated the matters at issue in the current case and that the resolution of those issues was essential to the prior decision. We have already listed the findings of fact essential to the District Court's decision to acquit petitioners. Petitioner asks us to find those facts as established in the current proceeding.

Respondent argues that respondent is not collaterally estopped because his burden of proof in the civil proceeding is less than the Government's burden of proof in the criminal prosecution. Respondent contends that the District

Court found that the Government had not established the required facts beyond a reasonable doubt but that the evidence presented may have been sufficient to establish the essential facts by clear and convincing evidence. Collateral estoppel generally does not apply to a judgment of acquittal by a jury in a criminal case because such judgments are usually based on a general verdict, and it is difficult and often impossible to determine the basis for the jury's decision. See *Helvering v. Mitchell,* 303 U.S. 391 (1938); cf. *Traficant v. Commissioner,* 89 T.C. 501, 510 n. 9 (1987). A court must "examine the record of a prior [criminal] proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." *Ashe v. Swenson,* 397 U.S. at 444 (fn. ref. omitted). If so, collateral estoppel cannot apply.

This case, however, is unusual. The jury was unable to reach a verdict, and a mistrial was declared. The judge then rendered a bench opinion granting the defendant's motion for acquittal and setting forth his reasons for doing so. We, therefore, know the facts and reasoning behind the acquittal.

First, it appears that the standard of proof in the Third Circuit in deciding whether to take a criminal case from a jury is whether the prosecution has presented "substantial evidence" to support a guilty verdict. See *United States v. Wolfson,* 454 F.2d 60, 63-65 (3d Cir. 1972), cert. denied 406 U.S. 924 (1972). This standard is also applied in the Second Circuit. *Neaderland v. Commissioner,* 424 F.2d 639, 642 (2d Cir. 1970), affg. 52 T.C. 532 (1969). As the Second Circuit noted in *Neaderland,* 424 F.2d at 643, if the standard of proof in granting a judgment of acquittal is "substantial evidence," then the burden of proof at that stage of the criminal proceeding before the District Court is similar to the burden of proof in the civil proceeding ("substantial evidence" compared to "clear and convincing evidence"). While not free from doubt, the District Court in petitioners' criminal case seems to have applied the "substantial evidence" standard. The District Court noted at the begin-

ning of the bench opinion that the standard to be applied was "whether or not a jury *could* find from the evidence and the law that guilt is established beyond a reasonable doubt" (emphasis added), i.e., whether there was enough evidence to permit a jury verdict. The District Court's granting of the motion for judgment of acquittal means that no reasonable person could infer guilt from the evidence presented, i.e., there was not substantial evidence of petitioners' guilt.

Second, respondent's argument ignores the distinction between factual findings and legal conclusions. The District Court first determined the facts that had been established. It then applied the relevant legal standard to those facts. The Court did not determine whether each fact had been established by substantial evidence but rather whether all of the facts presented by the Government constituted substantial evidence that would support a guilty verdict— i.e., whether a reasonable person could find that petitioners were guilty of tax evasion.

Third, respondent ignores the reasoning of the District Court's bench opinion. It is obvious from the District Court's opinion that the judgment of acquittal was *not* based on weighing of insufficient evidence but on an *absence* of evidence.

We, nevertheless, cannot accept the District Court's findings of fact as established in this proceeding. Although the factual issues in the criminal proceeding and the current civil proceeding are the same, the Government's ability to litigate the issues at the criminal trial was materially circumscribed compared to respondent's ability to do so in a civil proceeding. Because of the significant differences between civil and criminal proceedings, we do not believe that collateral estoppel is appropriate. Because of those differences, respondent has not had a "full opportunity" (*Montana v. United States*, 440 U.S. at 153), to litigate the fraud issues.

In *Neaderland v. Commissioner*, 424 F.2d 639 (2d Cir. 1970), affg. 52 T.C. 532 (1969), the taxpayer's motion for judgment of acquittal was granted following his jury trial on charges of willfully attempting to evade payment of tax

by filing fraudulent returns, in violation of section 7201. The taxpayer alleged that his criminal acquittal collaterally estopped respondent from proving fraud in the civil proceeding. The Second Circuit held that collateral estoppel did not apply because of "certain fundamental dissimilarities in the principles which govern the litigation of these virtually identical fraud issues in criminal and civil trials." 424 F.2d at 641. The Second Circuit explained that the differences between civil and criminal cases rendered the doctrine of collateral estoppel inapplicable, 424 F.2d at 643:

> There are other factors besides burden of proof which so alter the comparability of the proof of the elements of the civil case with that of the prior criminal action that it would be illogical and prejudicial to the administration of the law to wrap fact determination in the civil action in the straitjacket of a prior decision in the criminal case. Application of [collateral] estoppel under these circumstances would operate as an unnecessary encumbrance upon and frustration of customary lawful proceedings in civil actions for the ascertainment of truth. Without justification for doing so, it would, in a civil action, have a preclusive effect upon the Government's presentation of a charge of fraud, on which it has the burden of proof.
>
> These factors principally derive from the many constitutional safeguards which surround an accused in a criminal prosecution and which create wide differences between the "bundle of legal principles" which govern a criminal trial and those which apply to a civil suit. Their effect is most far-reaching in the permissible scope of proof. For example, the Government could not, in the criminal action, call Neaderland to the witness stand and examine him, though it was not barred from doing so in the subsequent civil case and thereby brought out highly probative evidence on the issue of fraud. Likewise, the Government's search for proof in a criminal case is hedged about by innumerable strictures whereas in civil proceedings there are pre-trial discovery and disclosure. Its effort to correct an error or initial failure of proof in a criminal trial may be barred by the prohibition against double jeopardy. Moreover, it cannot appeal from an acquittal, like that entered in the criminal prosecution which was a prelude to the present case, to challenge the possibly erroneous standard which the trial judge applied in dismissing the case.
>
> For these and other like reasons, the application of collateral estoppel against the Commissioner in this case would exemplify blind reliance upon doctrine in the face of obviously substantial dissimilarities between the legal principles governing the civil suit and those which were applicable in the criminal prosecution which preceded it.

These factors are also present in this case. Petitioners

could not be required to testify at their criminal trial. In the civil proceeding, however, respondent may call petitioners as witnesses and they must testify because, having been acquitted at their criminal trial, they no longer have a Fifth Amendment privilege against self-incrimination on those charges. Thus, respondent may be able to elicit information tending to establish fraud which could not have been brought out in the criminal trial. Further, the scope of pretrial discovery is significantly broader in a civil action. Finally, at the criminal trial, the judge held that the Government was bound by its allegation in the bill of particulars that the parking lots were the source of the unreported income. The Government thus was precluded from offering proof of other sources of unreported income. Respondent is not so constrained in the current civil proceeding. He may be able to prove fraud by showing that petitioners willfully underreported their income from other sources.

Collateral estoppel cannot apply if the party against whom it is asserted did not have a full and fair opportunity to litigate the issue in the earlier proceeding. *Allen v. McCurry,* 449 U.S. 90 (1980); *Meier v. Commissioner,* 91 T.C. 273 (1988). This is, therefore, not an appropriate case to apply the doctrine of collateral estoppel.

Petitioners also argue that respondent should be estopped, under the doctrine of judicial estoppel, from asserting that petitioners understated their income for 1975. Petitioners base their argument on a statement at the criminal trial by Special Agent Treppel. Treppel testified that his net worth calculations did not establish any underreporting of income for 1975. The doctrine of judicial estoppel has been asserted to preclude a party from taking a position inconsistent with a position taken in a prior litigation or any earlier stage of the same litigation. *Scarano v. Central R. Co. of New Jersey,* 203 F.2d 510, 512-513 (3d Cir. 1953). The purpose of the doctrine is to prevent litigants from "playing 'fast and loose' " with the judicial system, *Scarano v. Central R. Co. of New Jersey, supra* at 513, and to "protect the integrity of the courts and the

judicial process." *United Virginia Bank v. Saul Real Estate,* 641 F.2d 185, 190 (4th Cir. 1981).

The major flaw in petitioners' argument is that the year 1975 was not before the District Court. The doctrine of estoppel applies only when there has been a final judgment rendered by a court of competent jurisdiction. There was no final judgment as to petitioners' 1975 taxable year. Moreover, the special agent's statements are not relevant to the issue whether petitioners have any civil tax liability for 1975. The special agent merely concluded that there was insufficient evidence to establish a fraudulent understatement beyond a reasonable doubt and thus did not continue the criminal investigation into that year. He did not investigate whether there was sufficient evidence to establish a fraudulent understatement under the lower standard of proof applicable to civil fraud cases.

For similar reasons, we reject petitioners' assertion that respondent is bound by the amounts asserted as understatements in the indictment. First, in a criminal tax evasion case, it is not essential to establish a specific amount of unreported income, and the amount of unreported income was, therefore, not at issue in the criminal proceeding. See *United States v. Isaksson,* 744 F.2d at 578; *Considine v. United States,* 227 Ct. Cl. 77, 645 F.2d 925, 932 (1981), cert. denied 459 U.S. 835 (1982). Second, the Government asserted an amount of allegedly unreported income in the criminal proceeding that it believed it could establish beyond a reasonable doubt. Respondent is free to assert a larger deficiency in the civil proceeding in which the burden of proof is lower.

> *Petitioners' motion for partial summary judgment will be denied.*

---

Appendix A
follows on
page 997.

APPENDIX A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

vs.                              CRIMINAL NO. 82-218-01, 02

LEON SPEAR
JEANNETE SPEAR

- - -

Before HON. JAMES T. GILES, J.
Philadelphia, Pennsylvania
- - -
March 21, 1983
- - -
BENCH OPINION
- - -

APPEARANCES:

JOSEPH GONTRAM, ESQ.,
For the Government.

THOMAS BERGSTROM, ESQ.,
For the Defendant Leon Spear.

JOEL H. SLOMSKY, ESQ.,
For the Defendant Jeannete Spear.

Sidney S. Rothschild
OFFICIAL COURT REPORTERS
Room 2722
U.S. Courthouse
Philadelphia, Pa. 19106

THE COURT: I have decided to render a bench opinion in the case of U.S. vs. Leon Spear and Jeannette Spear. The bench opinion will not be long.

I have considered at great length the motions for acquittal. I have considered the Government's response to each of the motions. I have considered the Government's evidence in its case in chief, and the case as a whole. I have considered the quality effort made by both counsel and the quality time given by counsel and the Court to the jury, which

deliberated on this matter for some ten hours without reaching a decision. I am mindful of the standard to be applied at this stage, which is whether or not a jury could find that from the evidence and the law that guilt is established beyond a reasonable doubt. I have concluded, based on the foregoing that a jury could not find guilt beyond a reasonable doubt, and therefore the motion will be granted.

The Government is held to its representation in the bill of particulars that the net worth increase is attributable to the parking lots of the defendants.

The Government's burden was to show a likely source for the net worth increase or to negate sources of non-taxable funds. The Government did not meet its burden.

The evidence with respect to the parking lots as the likely source of the income, was that the parking lots returns filed with the City showed more income than was reported on the 1120s filed with the IRS. Agent Trepple testified that looking at accountant Brown's work papers, he could account for the number reported as net gross income on the 1120s. There was no evidence that what Brown did in terms of arriving at those figures was contrary to generally accepted accounting principles. Brown was not called as a witness by the Government.

Each of the parking lot tickets issued by the City was accounted for by the City with respect to the operation of the parking lots. The City conducted periodic audits which showed no variance and no reason to believe that either of the defendants was skimming money from the City or from the cash business in terms of what was reported to the City. The various attendants or parking lot managers called to testify by the Government stated unequivocally that he accounted for each of the parking lot tickets and receipts for each car to the collecting agent for the Spears, at the end of each day. No evidence was produced through those witnesses to the effect that there had been misappropriations of monies by any employee of the parking lots charged with the duty of collecting monies, nor was there any evidence that either of the defendants asked any employee to misappropriate or hide monies collected.

Looking at the years 1976 and 1977 together, the Spears' gross receipt deposits was approximately $1,148,000. Trepple's estimate of what the parking lots' income might have been in 1976 and 1977, taken together at the rate of $2.25, produces a figure roughly of $158,000 more. That figure of $2.25 does not account for early bird specials, various other discount rates utilized by defendants for the operation of the lots. A twenty-five cent error in the $2.25 figure, given the number of cars reported to have been parked in those two years would result in the figure of roughly $140,000. So I do not find that the 2.25 figure, even if credited, produced $370,000, which allegedly was the reported income difference, or the unreported income difference.

While it is true that in a net worth case, the Government does not have to prove unreported income to the penny, to the dollar, it does have the burden under the circumstances, particularly this case where there were periodic audits by the City, I believe, to show some figure from

which a fair inference could be drawn by a jury that the unreported income specified in the indictment was indeed willfully withheld by the defendants. Anything short of that, or materially short of that invites the grossest kind of speculation of the jury. For example, the appropriate rate, assuming agent Trepple's testimony, $2 or $2.25.

Mere evidence of increase in net worth is insufficient to support the assumption or an inference that there was unreported taxable income. At best the Government has shown that, assuming Agent Trepple's testimony to have been accurate in terms of his estimate of possible or maximum gross receipts, there was a differential of $150,000 unreported.

1. I find this is a material variance from what is charged in the indictment.

2. It is a variance created by a rate assumed in 1977, which does not appear to have any meaningful validity, that is the figure is not founded upon a receipt by receipt audit by the IRS, presumably those were available to the IRS, because the agent who collected the monies stated that they made the accountings for each particular patron on the back of each ticket. There was no evidence that those tickets were destroyed.

There was evidence offered by the defendants which countered that of Agent Trepple, only to the extent that using a different figure for the average rate per car of $2, and that produced, as Mr. Sinclair's figures, at a 95% occupancy rate, a total expected gross receipt for the three corporations for the two years of less than $1,148,000. The Court does not rely upon Sinclair's figures, for purposes of this ruling.

The Government points to specific items of taking monies from the corporate accounts, and using those monies for personal account purposes, even though the ultimate purpose for which the monies were used may have been traceable to the parking lot business, maybe not specifically to each of the three parking lots per se, but to a holding company called Faunce. A considerable amount of monies went into the Faunce Company.

There was testimony which was not rebutted that the Faunce Company is a holding company, a real estate holding company for the parking lots. And, it was uncontradicted that monies that went to Faunce would not have been, under generally accepted accounting principles, personal income for the Spears.

Agent Trepple testified that in his opinion, inasmuch as such monies flowed from the corporate account to a personal account, even though they may have been used ultimately for benefit for the corporations, through the Faunce Corporation to the parking lot corporation through the Faunce Corporation, that nevertheless it was personal income. However, Agent Trepple did not testify that the methodology used by the accountants for the Spears of treating that income as not personal income was contrary to generally accepted accounting principles. It is uncontradicted that the exclusions of such monies from the category of personal income was done by an accountant. It is also uncontradicted that the trail of that money that went into Faunce was above-board and clear for all to see, including the IRS, such that there is no room to argue that there was an effort to hide such monies; such trail was also clear to

the accountants Brown or Bolden, and such monies were treated as non-taxable income to the Spears. Whether it should in fact be treated as taxable income is not the issue before the Court. The issue is whether or not the jury could find willfulness from that set of facts where there is no dispute with Bolden's testimony that what was done was in accordance with generally accepted accounting principles.

There are other monies which the Government points [out], that were utilized by the Spears from the corporate accounts. Generally these fall into the category of advances by the Spears allegedly individually to the corporations for parking lot pavement and thereafter a repayment by check from the corporation to the Spears. This amounts, I believe to about $70,000, perhaps less.

The Defendants offered explanations for the utilization of those monies. The Government chose to proceed on a net worth theory to prove $366,000 of unreported income, knowing what specific items it had with respect to alleged unreported income. I will not redact the indictment at this point to make this a specific items case where $366,000 of unreported income is made in the charge in the indictment certain portions of that specific item income related to savings certificates purchased by the Spears or other such assets. With respect to each of those counts, savings accounts or otherwise, the Spears reported on their income tax forms the interest earned. This reporting runs contrary to the claim of willfulness with respect to tax evasion.

The Government's burden was to either prove a likely source of income, which I found it did not show with respect to the parking lots being the likely source of $366,000 of unreported income or fairly the likely source of net worth increase, or fairly the source of any sum which was greater than actually reported as deposited gross receipts for three corporations or the Government could proceed to prove net worth by negating all other possible sources of non-taxable income.

The Government's case in chief, no likely source of non-taxable income had been offered by the Defendants and the Government did not therefore attempt in the case in chief to negate all other possible sources of non-taxable income.

In terms of evaluating the Government's case at this point, while I could look at the entire case, I shall look at the case in chief, in terms of deciding whether or not the Government undertook to negate all possible sources of non-taxable income, and the reason for that simply is that inasmuch as the Government did not do so in its case in chief, but may have done so later, in fact it would, a contrary review of the evidence, would in effect require the Defendants to take the stand.

So, in the case in chief, the Government does not negate all possible sources of non-taxable income. Mr. Spear did not take the stand because the Court denied the motion for directed verdict at the close of the Government's case, that ruling by the Court had been based upon the fact that the Spears had reported net gross income on the 1120s and had responsibility for their reporting despite the accountant's preparation of the return. Perhaps that ruling was in error inasmuch as Agent Trepple

had testified that he could account for Brown's figures, looking at his work papers.

Looking at the case in whole, Leon Spear testified as to a non-taxable source. The jury could believe that or not. The Government made some efforts to discredit Mr. Spear. I accept Mr. Slomsky's argument that even if the jury were to discredit Mr. Spear, it still would have to be satisfied that the parking lots were a likely source of income.

In order for the jury to reach that conclusion the jury would have to believe that the Spears were engaged in the scheme of skimming monies from the parking lot receipts on a daily basis, and knowingly under-reporting to the City, even where the evidence shows that each parking lot ticket was accounted for and that the City audits showed no discrepancies.

The Government has certain broad parameters in a net worth case, to be sure, but those are not without limits.

The cases teach that net worth cases are to be viewed with much care and scrutiny by the reviewing Court. I believe I have done so in this instance.

For the reasons stated, I grant the motions for acquittal and this matter is concluded.

MR. SLOMSKY: Thank you.
THE COURT: Thank you, counsel.
(Whereupon the hearing was adjourned.)