RICHARD D. BOKUM II AND MARGARET B. BOKUM, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 19755-83.          Filed February 28, 1990.

*Richard C. Conover,* for the petitioners.[1]
*W. Scott Green,* for the respondent.

CHABOT, *Judge*\*: Respondent determined deficiencies in Federal individual income tax against petitioners as follows:

| Year[2] | Deficiency |
|---|---|
| 1977 | $879,877 |
| 1979 | 38,160 |
| 1981 | 37,923 |

After concessions,[3] the issues for decision are as follows:

---

[1]Petitioners were represented by Louis H. Diamond, Burton J. Haynes, and Wayne K. Johnson in this matter before June 10, 1986. On that date, a motion to withdraw by Haynes was granted based on a potential conflict of interest as a result of legal action petitioner Richard Bokum was contemplating bringing against these attorneys in an unrelated tax matter. A motion by Diamond and Johnson to withdraw was granted on Nov. 28, 1986. Conover's entry of appearance on behalf of Margaret Bokum was filed on Jan. 30, 1985, and on behalf of Richard Bokum on June 20, 1988.

\*By order of the Chief Judge, this case was reassigned to Judge Herbert L. Chabot for opinion and decision.

[2]On Form 4089, Notice of Deficiency—Waiver, the years are stated to be 1977, 1978, and 1979. On the notice of deficiency letter and on the other attached schedules, it is clear that the years are 1977, 1979, and 1981. The pleadings, the parties' stipulations, and other materials in the record make it clear that both sides understand that the years as to which deficiencies have been determined are 1977, 1979, and 1981. We conclude that 1977, 1979, and 1981 are the years properly before the Court in the instant case, and we so hold. *Saint Paul Bottling Co. v. Commissioner,* 34 T.C. 1137 (1960).

[3]The parties have agreed that the correct deficiencies are as follows:

| | |
|---|---|
| 1977 | $513,755.37 |
| 1979 | 29,016.00 |
| 1981 | - - - |

(1) Whether petitioners are judicially estopped from arguing that petitioner wife qualifies for innocent spouse tax benefits under section 6013(e)[4]; and

(2) If not, then whether petitioner wife qualifies as an innocent spouse with respect to any portion of petitioners' 1977 agreed tax deficiency.

### FINDINGS OF FACT

Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference.

When the petitions were filed in the instant case, petitioners Richard D. Bokum II (hereinafter sometimes referred to as Richard) and Margaret B. Bokum (hereinafter sometimes referred to as Margaret), husband and wife, had their legal residence in Miami, Florida. They have been married to each other since 1941.

Margaret received a high school diploma and attended college for 2 years. She was graduated from Finch College in New York City, but did not receive any training in business. In particular, she has never taken any courses in business, finance, accounting, or taxation. Throughout her married life, Margaret has never worked outside the home, but has devoted herself to managing the household and raising petitioners' six children.

Margaret is a beneficiary of certain trusts, established by her parents, which generate income for her of about $120,000 to $150,000 annually. She has lent money from time to time to Richard from her separate funds to finance his business ventures. She has not otherwise been personally involved in any of Richard's business affairs.

Richard is a geologist by training and a graduate of Princeton University. He is the founder and president of Bokum Resources Corp. (hereinafter sometimes referred to as Bokum Resources). Bokum Resources was established to engage in the mining and milling of uranium. Its shares were offered for sale to the public in December 1976. However, Bokum Resources was never able to begin operations because of the effect of safety concerns on the nuclear

---

[4]Unless indicated otherwise, all section and subchapter references are to sections and subchapters of the Internal Revenue Code of 1954 as in effect for the years in issue.

power industry, and was forced into involuntary chapter XI bankruptcy in December 1980.

In 1971, Richard formed Quinta Land & Cattle Co. (hereinafter sometimes referred to as Quinta), a subchapter S corporation with a June 30 fiscal year. Quinta was formed for the purpose of entering the cattle and ranch business through the purchase of an 11,000-acre cattle ranch (hereinafter sometimes referred to as the ranch) in Montana. To this end, Richard transferred shares in Bokum Resources to Quinta in exchange for all of its stock. Quinta then transferred the Bokum Resources shares and cash to Charles Kyd in exchange for all the shares of Kyd Cattle Co. which had title to the ranch. Margaret knew that Quinta acquired the ranch from Charles Kyd or from Kyd Cattle Co. Richard continued to own all of the outstanding shares of Quinta through the years in issue and was Quinta's president in 1977. Margaret never was a shareholder of Quinta. She was not an officer or director of Quinta in 1977. Margaret became an officer and director of Quinta in 1981; however, she was appointed merely to fill a vacancy and did not take any part in Quinta's affairs. Margaret did not do any bookkeeping for Quinta.

After Quinta bought the ranch, Richard made various improvements to the ranch property. An existing irrigation system was expanded and an office building and barn were constructed. He also built a home for his family on the ranch property in 1971, at a cost of about $800,000. Margaret has spent summers at the ranch since construction of the home.

During the fiscal year ended June 30, 1977, Quinta sold a substantial portion of the ranch to Madison River Cattle Co. for $3,800,000. This resulted in a gain of $3,119,045. Margaret knew of this sale, although she did not participate in the business decision to sell, and did not know how much Quinta received on the sale. The portion of the ranch on which the house was built and about 237 acres of surrounding land were not sold. After subtracting sales commissions, taxes, and payment of $1,005,000 owed to the Federal Land Bank on the property, the net sales proceeds of $2,095,000 were deposited into Richard's personal account. Richard used $1,677,795 of this amount to pay the balance of a

personal loan he had previously incurred from the First National Bank of Albuquerque. The proceeds of this loan had been transferred by Richard to Bokum Resources to pay operating expenses and to finance certain litigation. The remaining $417,205 of net sales proceeds were used for petitioners' personal living expenses. Margaret did not know what Richard did with the sales proceeds.

Petitioners' living expenses were about $500,000 per year, which included the cost of maintaining their two residences in the Miami area and the Montana ranch house, including the employment of three gardeners and a house servant in Florida and various employees in Montana. Petitioners also employed a captain and mate and incurred additional expenses in maintaining a yacht. Richard paid the household bills, and Margaret helped when he could not afford to pay the bills. Richard wrote most of the checks, but Margaret wrote some checks when Richard was out of town.

In its fiscal year ended June 30, 1977, Quinta distributed $3,553,678 (hereinafter sometimes referred to as the distribution) to Richard, Quinta's sole shareholder. On its Form 1120S, Quinta reported $2,605,272 of dividend distributions as long-term capital gain, and $948,406 as a nondividend distribution. For that fiscal year, Quinta reported taxable income of $2,605,272, which was the amount of its current earnings and profits.[5] With respect to the sale of the ranch, Quinta reported the gain as shown in table 1.

Table 1

| | | |
|---|---|---|
| Total gain | | $3,119,045 |
| Ordinary income | | |
| Recapture (livestock) | $260,414 | |
| Recapture (other) | - - - | |
| Inventory (livestock) | 230,425 | 490,839 |
| Long-term capital gain | | $2,628,206 |

Of the $3,800,000 sale price, $2,681,856 was allocated to land, $436,010 to various categories of depreciable property other than buildings and livestock (equipment, autos, irrigation systems, stockwells, and furniture and fixtures), $148,809 to buildings, and $533,325 to livestock.

---

[5] Both sides seem to have ignored whether Quinta had accumulated earnings and profits (we cannot tell from the record whether Quinta ever had been a nonsubchapter S corporation and had earnings and profits from presubchapter S years). We will assume that there were no accumulated earnings and profits.

Petitioners filed a joint Federal income tax return for 1977.[6] Each petitioner signed this tax return. Petitioners' 1977 Schedule D shows $541,347 as long-term capital gain, computed as follows: (1) Of the $3,553,678 distribution, petitioners did not report or otherwise account for the $948,406 nondividend distribution; (2) petitioners reported $2,605,272 as long-term capital gain from dividend distributions from Quinta;[7] (3) petitioners reduced that amount by $2,087,057, which was purportedly Richard's basis in his Quinta stock;[8] (4) petitioners reported the remaining $516,215 as long-term capital gain; and (5) petitioners also reported $25,132 as their share of net long-term gain from a trust, for a total net long-term capital gain of $541,347. Petitioners reduced this by $270,673 pursuant to section 1202, and reported capital gain of $270,674 as an element of adjusted gross income. The $516,215 amount that petitioners reported on their Schedule D, Part II, as a dividend distribution from Quinta and the $541,347 amount of their net long-term gain, are larger than any other amount

---

[6]The parties have stipulated that, "*During* the years 1977 and 1979 the petitioners filed joint federal income tax returns." (Emphasis added.) An examination of the stipulated 1977 tax return makes it clear that the 1977 tax return was filed in 1978. Accordingly, we disregard the stipulation on this point.

[7]A subchapter S corporation shareholder is to treat dividend distributions as long-term capital gain to the extent of the shareholder's pro rata share of the corporation's net capital gain for the year. Sec. 1375(a)(1). The Subchapter S Revision Act of 1982 (Pub. L. 97-354, 96 Stat. 1669) substantially changed the structure of the treatment of distributions to shareholders of subchapter S corporations. See current sec. 1368. However, this 1982 Act provision does not apply to the instant case.

[8]This operation is shown as follows on a schedule attached to petitioners' 1977 joint tax return.

Schedule D—1040 Part 2:

| | | |
|---|---:|---:|
| Dividend distributions—Quinta Land & Cattle Co.—Form 1120S 6-30-77 | | $2,605,272 |
| Less basis increased by loans to corporation by sole stockholder: | | |
| Total loans per books | $2,623,174 | |
| Added commissions on sale paid by R.D. Bokum personally subsequent to sale | 15,413 | |
| | 2,638,587 | |
| Deduct: Net assets remaining in corporation— | | |
| Assets  $1,143,681 | | |
| Liabilities  594,151 | | |
| Net assets remaining at cost | 549,530 | |
| Portion of loan ad-ed [sic] to basis | | 2,089,057 |
| Adjusted loan-term [sic] capital gain— | | |
| Schedule D Part II | | 516,215 |

appearing on petitioners' joint 1977 tax return (except for the amount in the schedule set forth in note 8, *supra*, and a $534,319 1975 loss amount utilized in calculating a loss carryover to 1977).

Neither Richard nor Margaret played any role in the preparation of their 1977 joint tax return nor in the formulation of the tax treatment to be accorded the distribution on the tax return. Although he was active in business, Richard had little understanding of the tax laws. All of petitioners' joint tax returns, including the 1977 tax return, were prepared by Richard's accountants. Beverly Roy, Richard's personal secretary for 18 years, assembled any necessary information on Richard's business and financial dealings. Richard signed the 1977 tax return prepared by his accountants and then presented it to Margaret for her signature. Petitioners each signed the tax return without reviewing its contents. At the time they signed the tax return, neither Richard nor Margaret knew that the tax return understated their income tax liability.

Although the 1977 joint tax return was prepared by Richard's accountants, the signature block did not include any information (signature, identifying number, address) required from paid preparers of tax returns.

On this tax return, in the Filing Status block, an "X" was typed at line 2, "Married filing joint return (even if only one had income)". On Schedule A of this tax return, the following appears on lines 39 through 41:

39 Total deductions (add lines 33 through 38). $288,822

40 If you checked Form 1040, box:

  2 or 5, enter $3,200
  1 or 4, enter $2,200
  3, enter $1,600

41 Excess itemized deductions (subtract
  line 40 from line 39). * * * $288,822

On this tax return petitioners show "None" as the "regular" income tax liability. The only tax liability shown on the tax return is a minimum tax of $46,112.

The parties have stipulated that petitioners have a deficiency of $513,755.37 for 1977.

In a stipulation filed May 14, 1985, and in a pair of stipulations for trial filed June 29, 1988, the parties came to an agreement resolving all issues raised by the notice of deficiency, leaving only the issue of Margaret's eligibility for innocent spouse status under section 6013(e) for 1977.[9]

In the notice of deficiency, respondent determined that petitioners understated their 1977 taxable income by (1) $606,684 on account of (a) a reallocation from long-term capital gain to recapture ordinary income of some of Quinta's gain on the sale of the ranch, and (b) a flowthrough of that reallocation to Richard, and (2) $1,054,607 on account of a disallowance of petitioners' claim of basis (see note 8, *supra*).

In their settlement, the parties agree that (1) the $606,684 reallocation flowthrough adjustment is reduced to $150,201[10] and (2) the $1,054,607 basis adjustment is reduced to $969,428.[11] (The parties also agree that petition-

---

[9]The 1985 stipulation also reserved the question of Margaret's innocent spouse status for 1979. That issue was removed by one of the June 29, 1988, stipulations that the understatement for 1979 did not meet the requirements of sec. 6013(e)(4); as a result, the parties stipulated, Margaret is not entitled to innocent spouse treatment for 1979.

[10]Quinta's total gain on the sale of the ranch is $3,119,045. The ordinary income portion of this gain is $663,974. (Of this total, recapture is $173,135 and sale of inventory is $490,839. All the inventory gain had been reported as ordinary income on Quinta's Form 1120S, part in one place and part in another place (see table 1, *supra*). Accordingly the entire increase in ordinary income results from allocating a total of $173,135 of the sale price away from the land and to equipment, autos, irrigation systems, stockwells, and furniture and fixtures.) This leaves $2,455,071 ($3,119,045 minus $663,974) as Quinta's long-term capital gain. The dividend portion of the distribution is $2,605,272. This leaves $150,201 ($2,605,272 minus $2,455,071) as the ordinary income portion of the dividend portion of the distribution.

[11]The $969,428 increase in petitioners' long-term capital gain is computed as follows:

|  | Per petitioners' tax return | As settled |
| --- | --- | --- |
| Distribution | $3,553,678 | $3,553,678 |
| (shown on Quinta's Form 1120S) | | |
| Nondividend | − 948,406 | − 948,406 |
| Dividend | 2,605,272 | 2,605,272 |
| Basis | − 2,089,057 | - - - |
| Ordinary income portion | - - - | [1]150,201 |
| Long-term capital gain | 516,215 | 2,455,071 |
| Sec. 1202 deduction | 258,107 | 1,227,535 |
| To AGI | 258,108 | 1,227,536 |
|  | | − 258,108 |
| Increase on account of settlement | | [2]969,428 |

[1]Flowthrough from Quinta. Reallocation of portions of the sale price away from land and to equipment, autos, irrigation systems, stockwells, and furniture and fixtures. This is dealt with in the opinion, *infra*, as the mischaracterization adjustment.

[2]Net of (a)(1) disallowance of basis claim on petitioners' 1977 tax return, minus (2) flowthrough from Quinta, minus (b) sec. 1202 deduction. This is dealt with in the opinion, *infra*, as the claim-of-basis adjustment.

ers' 1977 taxable income is to be increased by $1,835 (omitted interest income) and $3,200 (petitioners failed to subtract the zero bracket amount from their itemized deductions).)

On petitioners' 1977 joint tax return, they reported $1,207 adjusted gross income, minus $287,615 taxable income, and $46,112 tax liability (all of which is minimum tax). For 1977, the parties have stipulated to adjustments totaling $1,124,664 and to a deficiency of $513,755.37.

The parties' settlement reflects the parties' agreement that Richard's basis in his Quinta stock was $985,583.

On January 6, 1987, petitioners filed a motion to be relieved of the May 14, 1985, stipulation. Petitioners made their motion in order to claim a greater basis in Richard's Quinta stock. Petitioners apparently made their motion under the mistaken belief that proof of a basis greater than that inherent in the stipulated deficiency would further reduce the deficiency. We conclude that no portion of the stipulated deficiency was related to the nondividend portion of the distribution.

The amount of the dividend portion of the distribution depends on the amount of Quinta's earnings and profits; Richard's basis is entirely irrelevant to that calculation. Richard's basis is relevant, however, to the nondividend portion of the distribution. Because Richard's basis, per the settlement, is greater than the nondividend portion, no part of the nondividend portion is currently taxed. If Richard's basis were greater than the basis amount specified in the settlement agreement, then the basis available to "sop up" later years' nondividend distributions, or to be taken into account on a later disposition of the Quinta stock, would be greater. However, any tax consequence from such a greater basis in the Quinta stock would not affect petitioners' tax liability for 1977.

Petitioners' motion was denied on May 1, 1987.

### OPINION

Because the parties have focused much of their attention on the judicial estoppel issue, we will discuss this issue first. We then consider the requirements for innocent spouse status.

## I. *Judicial Estoppel*

Respondent contends that, under the doctrine of judicial estoppel, petitioners are precluded from arguing that the understatement of tax on their 1977 tax return was attributable to grossly erroneous items. He contends that petitioners, in order to meet the grossly-erroneous-items requirement for innocent spouse status, must show that the understatement was attributable to a claim of basis on the tax return for which there was no basis in fact or law. See sec. 6013(e)(2)(B). He contrasts this position with the motion to be relieved of stipulation, in which petitioners claimed that Richard's Quinta basis was greater than that upon which the stipulated deficiency was calculated. Respondent concludes that petitioners' contention that Richard's Quinta basis is higher than in the stipulation, and petitioners' argument that there was no basis in fact or law for the claim of basis on the tax return, are fundamentally inconsistent, and that the doctrine of judicial estoppel precludes petitioners from taking such inconsistent positions.

Petitioners argue that Margaret has consistently contended that she is entitled to innocent spouse status. Petitioners also argue that Margaret has not made any "intentional self-contradiction[s] * * * as a means of obtaining unfair advantage in a forum provided for suitors seeking justice", citing *Scarano v. Central R. Co. of New Jersey*, 203 F.2d 510, 513 (3d Cir. 1953). Petitioners conclude that the doctrine of judicial estoppel does not apply in the instant case.

We agree with petitioners.

The doctrine of judicial estoppel has been applied by several Courts of Appeals and rejected by a few; where it has been adopted, it has several forms and rationales. See generally discussions in M.J. Plumer, "Judicial Estoppel: The Refurbishing of a Judicial Shield", 55 Geo. Wash. L. Rev. 409 (1987); and R.G. Boyers, "Precluding Inconsistent Statements: The Doctrine of Judicial Estoppel", 80 Nw. U. L. Rev. 1244 (1987). Although this Court has considered the doctrine (e.g., *Spear v. Commissioner*, 91 T.C. 984, 995-996 (1988)), thus far we have not applied it so as to preclude a party from taking a position. (In *Reynolds v. Commissioner*, 861 F.2d 469 (6th Cir. 1988), we were reversed (T.C. Memo.

1987-261) for failing to apply the doctrine "under the unusual facts presented" in that case. 861 F.2d at 470. Our Memorandum Opinion did not discuss judicial estoppel. The facts in the instant case are substantially different from those in *Reynolds.*)

An often-quoted description of the doctrine is that a party "who has obtained relief from an adversary by asserting and offering proof to support one position may not be heard later in the same court to contradict himself in an effort to establish against the same adversary a claim inconsistent with his earlier contention." *Scarano v. Central R. Co. of New Jersey*, 203 F.2d at 513; *Jett v. Zink*, 474 F.2d 149, 155 (5th Cir. 1973). The purpose of the doctrine is to prevent litigants from "playing 'fast and loose with the courts'" (*Scarano v. Central R. Co. of New Jersey, ibid.*), and to protect the integrity of the courts and the judicial process. *United Virginia Bank v. B.F. Saul Real Estate*, 641 F.2d 185, 190 (4th Cir. 1981). See also *Spear v. Commissioner, supra.*

Another often-quoted description of the doctrine is as follows (*Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 598-599 (6th Cir. 1982)):

> The doctrine of judicial estoppel applies to a party who has successfully and unequivocally asserted a position in a prior proceeding; he is estopped from asserting an inconsistent position in a subsequent proceeding. *Smith v. Montgomery Ward & Co.*, 388 F.2d 291, 292 (6th Cir. 1968). See *City of Kingsport v. Steel & Roof Structure, Inc.*, 500 F.2d 617, 620 (6th Cir. 1974) (success in prior proceeding necessary). * * * The essential function of judicial estoppel is to prevent intentional inconsistency; the object of the rule is to protect the judiciary, as an institution, from the perversion of judicial machinery. * * * Judicial estoppel addresses the incongruity of allowing a party to assert a position in one tribunal and the opposite in another tribunal. If the second tribunal adopted the party's inconsistent position, then at least one court has probably been misled. * * *

We do not attempt, in the instant case, to set forth a comprehensive determination of this Court's view of the doctrine of judicial estoppel. We conclude that, whatever the view that we ultimately adopt, judicial estoppel is not appropriate in the instant case.

Firstly, petitioners did not successfully urge that Richard's basis in the Quinta stock was greater than the

amount stipulated to. In fact, the only determination we made as to this matter was to deny petitioners' motion to be relieved of the stipulations.

Secondly, the record does not include any evidence that petitioners were playing "fast and loose with the courts". Respondent mischaracterizes petitioners' position on the innocent spouse issue. Petitioners argue that the understatement of tax for 1977 was attributable to an omission of income (see sec. 6013(e)(2)(A)), not that the claim of basis on the tax return had no basis in fact or law (see section 6013(e)(2)(B)). Regardless of the validity of petitioners' argument, it is not at odds with petitioners' separate contention that the stipulation was based on too low a basis in Quinta stock.

Thirdly, even if we assume that the proper ground for petitioners' claim of innocent spouse status is that there was no basis in fact or law for the claim of basis on the tax return, there is nothing inherently inconsistent between this position and a position that the actual amount of basis was understated in the stipulation. As discussed *infra*, petitioners' reduction of the amount of the dividend distribution by basis in *any* amount is erroneous. Thus, petitioners' argument in their motion to be relieved of stipulation, that the basis was understated in the stipulation, is not inconsistent with an argument in chief that the claim of basis in any amount as a reduction in the taxable amount of the dividend distribution was grossly erroneous. See also Rule 31(c).[12]

We hold for petitioners on this issue.

## II. *Innocent Spouse*

Under section 6013(d)(3), if a husband and wife file a joint tax return for a year, then "the tax shall be computed on the aggregate income and the liability for the tax shall be joint and several." Under section 6013(e),[13] if certain

---

[12]Unless indicated otherwise, all Rule references are to the Tax Court Rules of Practice and Procedure.

[13]Sec. 6013 provides, in pertinent part, as follows:

SEC. 6013. JOINT RETURNS OF INCOME TAX BY HUSBAND AND WIFE.

  (e) SPOUSE RELIEVED OF LIABILITY IN CERTAIN CASES.—

    (1) IN GENERAL.—Under regulations prescribed by the Secretary, if—

      (A) a joint return has been made under this section for a taxable year,

requirements are met for a year, then a spouse may be relieved of a portion of this joint tax return liability for the year.

In order to qualify Margaret for innocent spouse status for 1977, petitioners must show that: (1) Margaret and Richard filed a joint tax return for 1977; (2) on that joint tax return there is a substantial understatement of tax; (3) the substantial understatement of tax is attributable to grossly erroneous items; (4) the grossly erroneous items are items of Richard; (5) in signing the 1977 joint tax return, Margaret did not know, and had no reason to know of the substantial understatement; and (6) it is inequitable to hold Margaret liable for the deficiency attributable to the substantial understatement. Also, as elements of item (3), *supra*, if the items are claims of deduction, credit, or basis, then (3a) these items must have no basis in fact or law, and (3b) the tax liability for these items must exceed a certain percentage of petitioners' 1982 adjusted gross income, i.e., the preadjustment year. Sec. 6013(e).

Petitioners bear the burden of proving that Margaret has satisfied each statutory requirement of section 6013(e). Or, putting it the other way, petitioners' failure to prove any one of the controverted statutory requirements will prevent Margaret from qualifying for relief. *Stevens v. Commissioner*, 872 F.2d 1499, 1504 (11th Cir. 1989), affg. a

---

(B) on such return there is a substantial understatement of tax attributable to grossly erroneous items of one spouse,

(C) the other spouse establishes that in signing the return he or she did not know, and had no reason to know, that there was such substantial understatement, and

(D) taking into account all the facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such substantial understatement,

then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent such liability is attributable to such substantial understatement.

(2) GROSSLY ERRONEOUS ITEMS.—For purposes of this subsection, the term "grossly erroneous items" means, with respect to any spouse—

(A) any item of gross income attributable to such spouse which is omitted from gross income, and

(B) any claim of a deduction, credit, or basis by such spouse in an amount for which there is no basis in fact of law.

[Although the year before us is 1977, we apply the statute as amended in 1984. This is because sec. 424(a) of the Tax Reform Act of 1984 (division A of the Deficit Reduction Act of 1984), Pub. L. 98-369, sec. 424(a), 98 Stat. 494, 801-802, amended sec. 6013(e) retroactively to all open years to which the Internal Revenue Code of 1954 applies. Sec. 6013(e)(1)(C) is essentially similar to the prior law's sec. 6013(e)(1)(B).]

Memorandum Opinion of this Court;[14] *Purcell v. Commissioner,* 826 F.2d 470, 473 (6th Cir. 1987), affg. 86 T.C. 228 (1986); *Sonnenborn v. Commissioner,* 57 T.C. 373, 381-383 (1971); Rule 142(a).

The parties agree that a joint return was filed (item (1) *supra*—see section 6013(e)(1)(A)), that the stipulated understatement of tax liability was substantial within the meaning of section 6013(e)(3) (item (2) *supra*—see part of section 6013(e)(1)(B)), and that the understatement exceeded the percentage of income requirements of section 6013(e)(4) as to 1982, the preadjustment year (item (3b) *supra*—see part of section 6013(e)(1)(B)).

Still in dispute is whether Margaret meets the remaining requirements for innocent spouse status as to two of the stipulated adjustments to taxable income. These two adjustments are (1) the mischaracterization of ordinary income as long-term capital gain ($150,201), and (2) the reduction of Richard's dividend income by Richard's claimed basis in Quinta's stock ($969,428).[15]

With respect to these adjustments, respondent contends that Margaret does not qualify for innocent spouse status because: (a) The adjustments in issue are not items "of" Richard (as required by section 6013(e)(1)(B)); (b) these adjustments are not "grossly erroneous items" (because they are deduction, etc., items and petitioners failed to show that the items "have no basis in fact or law", as required by section 6013(e)(2)(B)); (c) Margaret knew or had reason to know of these adjustments (see section 6013(b)(1)(C)); and (d) it is not inequitable to hold Margaret liable for the deficiency attributable to these adjustments (see section 6013(b)(1)(D)).

Petitioners contend that: (a) The adjustments in issue were items "of" Richard; (b) these adjustments are omissions from gross income, which automatically qualify as "grossly erroneous" (see section 6013(e)(2)(A)); (c) Margaret did not know or have reason to know of these adjustments; and (d) it is inequitable to hold Margaret liable for the deficiency attributable to these adjustments.

---

[14]T.C. Memo. 1988-63.

[15]Petitioners did not raise arguments as to whether Margaret was an innocent spouse as to the $1,835 of omitted interest income or the $3,200 attributable to excess itemized deductions. Innocent spouse status thus is unavailable as to the deficiency attributable to these items.

We agree with petitioners that both of the adjustments are items of Richard. We agree with respondent that both of the adjustments are deduction, etc., items and not income items. We agree with respondent that Margaret is not entitled to innocent spouse status as to the mischaracterization adjustment because petitioners' tax return treatment of this item had a basis in fact or law. We agree with petitioners that the claim-of-basis adjustment had no basis in fact or law. However, we agree with respondent that Margaret is not entitled to innocent spouse status as to the claim-of-basis adjustment because Margaret knew or had reason to know of the substantial understatement.

## A. *Items "of" Richard*

The parties have stipulated that "The deficiencies in this case arose from the distribution of funds from [Quinta] during the Corporation's 7706 year."[16] Thus, both the mischaracterization adjustment and the claim-of-basis adjustment derive from Quinta's activities. Richard was Quinta's sole shareholder during 1977. Quinta's distribution was to Richard. If Richard had filed a separate tax return for 1977, then the distribution would have been reportable on Richard's tax return, not on Margaret's. We conclude that the items from which Margaret seeks innocent spouse relief are items "of" Richard, within the meaning of section 6013(e)(1)(B).

On opening brief, respondent argues that because Margaret lived on the ranch in the summers and became a director and officer of Quinta in 1981, the grossly erroneous items are somehow attributable to her. Respondent's argument is most unpersuasive. The portion of the ranch on which the Bokum's summer house was located was not part of any of the transactions in question. It does not appear to be relevant whether Margaret became an officer and director of Quinta in 1981, as that was several years after the transaction in question. Even then, Margaret was a mere figurehead and did not assume any role in the affairs of

---

[16]We assume that the parties did not mean this stipulation to apply to the omitted interest income adjustment and the zero bracket amount adjustment. If the stipulation were intended to apply to those two adjustments, then it would be incorrect and we would disregard it.

Quinta. Margaret would not be taxable with regard to either of these adjustments if she had not filed a joint tax return with Richard for 1977. Respondent's reasoning on this point does not appear to have a discernible relationship to respondent's conclusion.

We hold for petitioners on this issue.

B. *Mischaracterization of ordinary income as long-term capital gain*

In analyzing whether Margaret qualifies for innocent spouse status on account of the mischaracterization adjustment, we consider the requirement in section 6013(e)(1)(B), that petitioners establish that the mischaracterization of ordinary income as long-term capital gain is a "grossly erroneous" item.

Section 6013(e)(2) defines "grossly erroneous items" to include, in general, all omissions from gross income. However, a claim of deduction, credit, or basis can be a grossly erroneous item only if "there is no basis in fact or law" for the claim. *Purcell v. Commissioner,* 86 T.C. at 240. Thus, in order to determine whether the mischaracterization adjustment is a grossly erroneous item, we first must determine whether it is an income item or a deduction, etc., item. *Flynn v. Commissioner,* 93 T.C. 355, 360 (1989). This matter is to be determined at the level of petitioners' 1977 joint tax return. *Flynn v. Commissioner, supra,* 93 T.C. at 362-363.

On their 1977 tax return, petitioners reported the entire dividend portion of the distribution from Quinta. Thus, even though the parties' settlement shows that Quinta's misallocation caused petitioners to report too much as long-term capital gain and too little as a dividend, the mischaracterization adjustment to petitioners' tax return does not add an item or an amount that had been *omitted from gross income.* As a result, the mischaracterization item is not an income item.[17] Rather, the effect of the mischaracterization

---

[17]On its Form 1120S, Quinta reported the entire gross income from the sale of the ranch. Thus, even though the parties' settlement shows that Quinta misallocated the sale price among the different assets, and so reported less ordinary income and more long-term capital gain than it should have, the mischaracterization adjustment to Quinta's Form 1120S does not add an item of gross income that had been omitted from gross income. As a result, even at the Quinta level, this is not an omission-from-gross-income item.

adjustment to petitioners' tax return is to disallow petitioners' section 1202 deduction against this item. Thus, the mischaracterization adjustment relates to a "claim of a deduction", and so petitioners have the burden of establishing that their treatment of the mischaracterization item had no basis in fact or law. Sec. 6013(e)(2)(B). See *Purcell v. Commissioner*, 86 T.C. at 240. The statute does not define the phrase "no basis in fact or law." This Court has stated that—

a deduction has no basis in fact when the expense for which the deduction is claimed was never, in fact, made. A deduction has no basis in law when the expense, even if made, does not qualify as a deductible expense under well-settled legal principles or when no substantial legal argument can be made to support its deductibility. Ordinarily, a deduction having no basis in fact or in law can be described as frivolous, fraudulent, or, to use the word of the [Ways and Means] committee report [on the Tax Reform Act of 1984], phony.

*Belk v. Commissioner*, 93 T.C. 434, 442 (1989); *Douglas v. Commissioner*, 86 T.C. 758, 762-763 (1986), affd. __ F.2d __ (10th Cir. 1989). See also *Purcell v. Commissioner*, 826 F.2d at 475-476. Petitioners' concession, that they erred in claiming the section 1202 deduction with respect to the mischaracterized ordinary income, is not sufficient to establish that the claimed deduction had no basis in fact or law. *Purcell v. Commissioner*, 86 T.C. at 239, affd. 826 F.2d at 476 n. 7.

The mischaracterization adjustment is based on reallocating $173,135 of the total $3,800,000 sale price. See note 10, *supra*. In effect, the parties agree that only $2,508,721 should have been allocated to the land (instead of the $2,681,856 shown on Quinta's 1120S; see text after table 1, *supra*) and $609,145 should have been allocated to the aggregate of equipment, autos, irrigation systems, stockwells, and furniture and fixtures (instead of the $436,010 aggregate shown on Quinta's 1120S). This error in allocating less than 5 percent of the total sale price does not strike us as "frivolous", "fraudulent", or "phony".

On answering brief, petitioners direct our attention to the parties' stipulation that: "The deficiency claimed by respondent for the year 1977 stems from the classification of income from the sale of assets of an S-Corporation", and

that "The commissioner determined a different allocation of the sales price of assets sold by Quinta which triggered ordinary income from the recapture of depreciation under section 1245."

Petitioners conclude from this that the mischaracterization adjustment is an omission-from-gross-income item, described in section 6013(e)(2)(A).[18]

Firstly, although the stipulations correctly note that the mischaracterization adjustment deals with "income", the stipulations also carefully avoid describing the mischaracterization adjustment as one that deals with something "which is omitted from gross income". The operative statutory term is "omitted from gross income". Since the stipulations do not deal with that matter, they afford no assistance to petitioners on this point.

Secondly, if the stipulations were to be regarded as stipulations that the mischaracterization adjustment corrects an omission from gross income, then we would ignore that aspect of the stipulations. As the Court of Appeals for the Fifth Circuit (see *Bonner v. City of Prichard, Ala.,* 661 F.2d 1206, 1207 (11th Cir. 1981)) pointed out in *King v. United States,* 641 F.2d 253, 258-259 (5th Cir. 1981):

A court is not bound by the parties' stipulations of law, particularly when those stipulations are erroneous. *Swift & Co. v. Hocking Valley Ry. Co.,* 243 U.S. 281, 289, 37 S. Ct. 287, 289, 61 L.Ed. 722 (1917); *Equitable Life Assur. Soc. of United States v. MacGill,* 551 F.2d 978, 983 (5th Cir. 1977), reh. denied 554 F.2d 1065 (5th Cir. 1977).

To the same effect see, e.g., *Greene v. Commissioner,* 85 T.C. 1024, 1026 n. 3 (1985).

Thirdly, as we have explained, *supra,* neither Quinta nor petitioners omitted anything from gross income with respect to the mischaracterization adjustment. Thus, even if petitioners' interpretation of the stipulations were correct, and even if the stipulations were regarded as not being as to matters of law, we would set them aside as being plainly in conflict with the undisputed evidence in the record. E.g., *Jasionowski v. Commissioner,* 66 T.C. 312, 318 (1976).

---

[18]We note that respondent, the other party to the stipulations, apparently does not understand that he has stipulated to the legal status of this item by his agreement to the use of the word "income" in the two noted stipulations.

We conclude that the mischaracterization adjustment was not a grossly erroneous item. Accordingly, Margaret is not entitled to innocent spouse status with regard to this adjustment.

We hold for respondent on this issue.

## C. *Claim of basis*

In analyzing whether Margaret qualifies for innocent spouse status on account of the claim-of-basis adjustment, we first consider the requirement in section 6013(e)(1)(B), that petitioners establish that their subtraction of Richard's claimed Quinta stock basis from the Quinta dividend is a "grossly erroneous" item.

Under section 6013(e)(2)(B), a claim of basis is not a grossly erroneous item unless it is "in an amount for which there is no basis in fact or law." Under section 301(a), a distribution by a corporation to a shareholder with respect to its stock is treated in the manner provided in section 301(c). Quinta's distribution to Richard is treated in the manner provided in section 301(c). Under sections 301(c)(1) and 316(a), that portion of the distribution which is out of earnings and profits is includible in gross income. Of the total $3,553,678 distribution, petitioners properly reported $2,605,272 (the amount equal to Quinta's earnings and profits) as a dividend. However, petitioners then subtracted what they claimed to be Richard's basis in Quinta stock ($2,089,057) from the dividend. There is no basis in law for subtracting Richard's Quinta stock basis in arriving at petitioners' gross income or adjusted gross income.[19]

We conclude that petitioners have established that their subtraction of Richard's claimed Quinta stock basis from the Quinta dividend is a "grossly erroneous" item, within the meaning of section 6013(e)(2)(B), and that petitioners have thus satisfied the requirement of section 6013(e)(1)(B) with regard to the claim-of-basis adjustment.

We next consider the requirement in section 6013(e)(1)(C), that petitioners establish "that in signing the return

---

[19]Paragraphs (2) and (3) of sec. 301(c) provide for subtracting stock basis from a distribution, but they deal only with the amount of a distribution in excess of earnings and profits. In the instant case, Quinta's distribution exceeded Quinta's earnings and profits, and all of that excess was properly excluded from petitioners' income. The basis deduction that we deal with in the innocent spouse issue is not the one authorized by sec. 301(c).

[Margaret] * * * did not know, and had no reason to know" of the substantial understatement in issue.

In *Purcell v. Commissioner,* 86 T.C. at 238, we pointed out that, under the law as it was before the retroactive amendments made by the Tax Reform Act of 1984,[20]—

the cases are clear that the spouse claiming to be relieved from liability for omission from income of an item must be unaware of the circumstances which give rise to that omission and not merely to the tax consequences of the facts. *McCoy v. Commissioner,* 57 T.C. 732 (1972); *Quinn v. Commissioner,* 62 T.C. 223 (1974), affd. 524 F.2d 617 (7th Cir. 1975); *Smith v. Commissioner,* 70 T.C. 651, 672-673 (1978). * * *

The 1984 Act amendments substantially revised the language of section 6013(e), but much of the language revision (compare note 13 with note 20) appears to have been designed to accommodate the policy change of permitting relief in the case of a "claim of a deduction, credit, or basis * * * in an amount for which there is no basis in fact or law" (section 6013(e)(2)(B)), while continuing the prior law's policy of permitting relief in the case of amounts "omitted from gross income" (section 6013(e)(2)(A), prior law section 6013(e)(1)(A)).

In particular, the language changes made by the 1984 Act have not changed the old rule that the taxpayer claiming

---

[20]Before the enactment of the retroactive amendments by the Tax Reform Act of 1984. Sec. 6013(e) provided, in pertinent part, as follows:

SEC. 6013. JOINT RETURNS OF INCOME TAX BY HUSBAND AND WIFE.

(e) SPOUSE RELIEVED OF LIABILITY IN CERTAIN CASES.—

(1) IN GENERAL.—Under regulations prescribed by the Secretary, if—

(A) a joint return has been made under this section for a taxable year and on such return there was omitted from gross income an amount properly includable therein which is attributable to one spouse and which is in excess of 25 percent of the amount of gross income stated in the return,

(B) the other spouse establishes that in signing the return he or she did not know of, and had no reason to know of, such omission, and

(C) taking into account whether or not the other spouse significantly benefitted directly or indirectly from the items omitted from gross income and taking into account all other facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such omission,

then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent that such liability is attributable to such omission from gross income.

(2) SPECIAL RULES.—For purposes of paragraph (1)—

(A) the determination of the spouse to whom items of gross income (other than gross income from property) are attributable shall be made without regard to community property laws, and

(B) the amount omitted from gross income shall be determined in the manner provided by section 6501(e)(1)(A).

innocent spouse status must establish that he or she is unaware of the circumstances that give rise to error on the tax return, and not merely be unaware of the tax consequences. *Purcell v. Commissioner,* 86 T.C. at 237-238, affd. 826 F.2d at 473-474.

In *Purcell,* the taxpayers reported income from the sale of stock as long-term capital gain. Part of this should have been reported as ordinary income from a covenant not to compete, which was included in the contract for the sale of the stock. The taxpayer wife knew of the covenant; she had initialled a significant amendment to the covenant; and she was personally subject to the covenant. She did not, however, understand the tax consequences of the covenant. Under these facts, we held that the taxpayer wife's knowledge of the covenant not to compete was enough to disqualify her from innocent spouse status as to that adjustment. The Court of Appeals for the Sixth Circuit affirmed our holding that the knowledge contemplated by section 6013(e) is not knowledge of the tax consequences of the transaction. *Purcell v. Commissioner,* 826 F.2d at 474.

While it is clear that, to qualify as an innocent spouse, Margaret must not have knowledge (nor reason to know) of the underlying circumstances which gave rise to the adjustment in issue (i.e., petitioners' claim of basis which erroneously offset the dividend from Quinta), it is unclear what the underlying transaction was in the instant case.

The parties have stipulated that "The deficiencies in this case arose from the distribution of funds from * * * Quinta" and "The deficiency claimed by respondent for the year 1977 stems from the classification of income from the sale of assets of [Quinta]".

We have found that Margaret knew of the sale of the ranch. Petitioners' erroneous claim of basis stems from a misapprehension of the tax consequences and not of the facts of the sale. Accordingly, if the relevant underlying transaction is that sale, then Margaret knew of the circumstances that gave rise to the substantial understatement and thus is disqualified from the innocent spouse status under section 6013(e)(1)(C).

The distribution from Quinta is referred to in two places on petitioners' joint 1977 tax return. Schedule D, Part II, shows the following:

Quinta Land and Cattle
Company—SBC
Dividend distributions—see Schedule 1    516,215

The "Schedule 1" there referred to is the material set forth in note 8, *supra*. Thus, the fact of the Quinta distribution is set forth prominently on the 1977 joint tax return that Margaret signed. The $2,605,272 distribution amount and the $2,089,057 basis deduction amount, set forth on Schedule 1, far exceed any amount shown anywhere else on the tax return. The $516,215 "Adjusted loan-term [sic] capital gain" amount (on Schedule 1) that results from the basis deduction exceeds all but one of the amounts shown elsewhere on the tax return. (The $516,215 is shown on Schedule D and is a component of the $541,347 net long-term gain on Schedule D; the latter amount is the only amount that exceed the $516,215 net resulting from the Quinta distribution.) Thus, a cursory glance at the tax return would have brought the distribution and the basis deduction to Margaret's attention. The distribution, and the tax treatment of the distribution, were not hidden in the recesses of the tax return; one did not have to be a tax expert to see that a large distribution from Quinta was being reported on the tax return. Nor did one have to be a tax expert to see that $2,089,057 was being subtracted from that distribution. More to the point, a reasonable person with Margaret's background—if she had merely quickly turned the pages of the tax return that she was at the point of signing—would have noticed the largest numbers on the return in the schedule reporting the Quinta dividend ($2,605,272) and the subtraction of basis ($2,089,057) therefrom (see note 8, *supra*).

When Margaret signed the tax return, she could not have avoided noticing that the tax return preparer's block, next to the line where she was signing, was not filled in. If she had looked at the very next page of the tax return, the Schedule A, she would have noticed the obvious error of the

tax return preparer's failure to subtract the $3,200 zero bracket amount from the itemized deductions.

The size of the basis amount that was subtracted should have prompted Margaret (and Richard as well) to question the correctness of the treatment of that item. With so much at stake, a reasonable person with Margaret's (or Richard's) background would be on notice to inquire further. The failure of the accountant to sign the tax return should have made Margaret (and Richard) wonder about whether the accountant was really standing up for the advice embodied in the tax return. The obvious error on the Schedule A should have caused Margaret (and Richard) some concern about the accuracy of the accountant's advice.

Margaret did not examine the tax return that she signed. She cannot obtain the benefits of section 6013(e) by simply turning a blind eye to—by preferring not to know of—facts fully disclosed on a tax return, of such a numerical magnitude as would reasonably put her on notice that further inquiry would need to be made. See the cases collected in *Levin v. Commissioner,* T.C. Memo. 1987-67. Margaret undertook responsibilities when she signed the 1977 joint tax return. She cannot escape these responsibilities by simply ignoring the contents of this tax return. *Stevens v. Commissioner,* 872 F.2d at 1507.

The standard to be applied in determining whether a putative innocent spouse has "reason to know," under section 6013(e)(1)(C) is whether "a reasonably prudent taxpayer under the circumstances of the spouse at the time of signing the return could be expected to know that the tax liability stated was erroneous or that further investigation was warranted." *Stevens v. Commissioner,* 872 F.2d at 1505 (fn. ref. omitted); *Shea v. Commissioner,* 780 F.2d 561, 566 (6th Cir. 1986), affg. on this issue and revg. on another issue a Memorandum Opinion of this Court.[21] This standard applies to deduction, etc., matters, as well as income matters. 872 F.2d at 1505 n. 8.

Accordingly, we conclude that Margaret either knew or should have known of the circumstances that gave rise to the substantial understatement and thus is disqualified,

[21]T.C. Memo. 1984-310.

under section 6013(e)(1)(C), from innocent spouse status as to the claim-of-basis item.

In *Stevens v. Commissioner, supra,* the Court of Appeals for the Eleventh Circuit (to which appeal lies in the instant case) recently set forth its position on the "reason to know" component of the innocent spouse provisions. In *Stevens,* the taxpayer claimed innocent spouse relief from disallowances of tax shelter deductions and of the resulting loss carryovers. For the 4-year period before the Court in that case, the Stevens' tax returns showed that they owed a total of $2,240 in taxes, while claiming tax shelter deductions of more than $1,200,000. 872 F.2d at 1501-1502.

In affirming our denial of innocent spouse relief, the Court of Appeals relied on the following: (1) The taxpayer was present during numerous conversations concerning her husband's business investments; (2) the taxpayer had information regarding the investments in question through her position as the secretary and bookkeeper for her husband's corporations; and (3) the taxpayer's husband had discussed his personal investments with the taxpayer to inform her that those investments had been made. 872 F.2d at 1506-1507.

Also, the Court of Appeals noted the taxpayer's assertion that her husband made a concerted effort to keep her ignorant about the family finances. In that regard, the Court of Appeals stated as follows (872 F.2d at 1507):

Significantly, Mrs. Stevens implied that she questioned the fact that the returns for 1976, 1977, and 1978 showed that no income taxes were due and admitted asking both for an explanation and for copies of all the returns. Ultimately, she confessed, she "blindly" signed the returns. A spouse cannot harbor doubts about the accuracy of a return and then turn a blind eye toward it. See *Sanders [v. United States],* 509 F.2d [162] at 169 [5th Cir. 1975]. In signing a return, a taxpayer represents that the matters stated therein are true and correct to the best of his or her knowledge. That responsibility cannot be abdicated or evaded merely by ignoring returns that are suspect and which would prompt a reasonable person in the same position to investigate before signing them.

The facts in *Stevens* differ in some respects from those in the instant case. Margaret was not personally involved in Richard's business affairs; Margaret did not have access to the corporate books as bookkeeper or secretary; and Margaret did not ask for any explanation of the items on

the 1977 tax return. As to those elements, respondent's case against the taxpayer in *Stevens* was stronger than is his case against Margaret.

The opinion in *Stevens* does not directly set forth how the Court of Appeals would rule on the facts in the instant case. However, the opinion does state as follows (872 F.2d at 1505 n. 8):

We reject Mrs. Stevens' assertion that she did not have "reason to know" that the deductions were phony because of her insufficient legal acumen. As a practical matter, this argument is tantamount to a claim that ignorance of the law is an element of the innocent spouse defense, and, as such, is incorrect. See *Sanders v. United States,* 509 F.2d 162, 169 n. 14 (5th Cir. 1975). A taxpayer is presumed to have knowledge of the tax consequences of a transaction, but is not presumed to have knowledge of the transaction itself. See *Quinn v. Commissioner,* 524 F.2d 617, 626 (7th Cir. 1975).

We believe that under the standards set forth in *Stevens,* the Court of Appeals for the Eleventh Circuit would consider Margaret's knowledge of the sale of the ranch, together with the plain description on the tax return and the comparative magnitude of the numbers set forth on the tax return, and would conclude that Margaret had reason to know of the erroneous claim of basis. Accordingly, we believe that those standards would lead to the result that Margaret is not entitled to innocent spouse status. Because the opinion of the Court of Appeals for the Eleventh Circuit does not require a result different from the result we reach in the instant case, there is no occasion to consider the applicability of the so-called "Golsen rule" (*Golsen v. Commissioner,* 54 T.C. 742, 756-757 (1970), affd. 445 F.2d 985 (10th Cir. 1971)).

The Court of Appeals for the Ninth Circuit has recently reversed an unreported Bench Opinion of this Court on our interpretation of section 6013(e)(1)(C). *Price v. Commissioner,* 887 F.2d 959 (9th Cir. 1989). *Price* involved disallowance of a Schedule C deduction for "Exploration and Development Expenses" arising from a Cal-Colombian Mines tax shelter investment made by the taxpayer husband. The taxpayer wife knew the underlying facts of the investment in the Cal-Colombian tax shelter, but did not understand the tax consequences. In our Bench Opinion, we

held that the taxpayer wife's "knowledge of the facts of the investment in Cal-Colombian Mines precludes relief under Section 6013(e)".

The Court of Appeals stated that it would "decline to follow the [T]ax [C]ourt's literal superimposition of the legal standard developed in omission cases onto deduction cases" (887 F.2d at 963 n. 9); that the statute "requires a spouse seeking relief to establish that she did not know and did not have reason to know *that the deduction would give rise to a substantial understatement*" (887 F.2d at 963; emphasis added; fn. ref. omitted); that the first step in the analysis should be to analyze whether "the record contains [any] evidence to suggest that [the taxpayer wife] *knew* upon signing the return that it contained a substantial understatement for any reason" (887 F.2d at 964, emphasis in original); and that the second step should be to analyze whether the taxpayer wife had reason to know of the substantial understatement (887 F.2d at 964).

We must decide, in the instant case, whether to adhere to our position in *Price* and the prior opinions on which that position is based, or modify our position in accordance with the ruling of the Court of Appeals for the Ninth Circuit. *Groetzinger v. Commissioner,* 82 T.C. 793, 796 (1984), affd. 771 F.2d 269 (7th Cir. 1985), affd. 480 U.S. 23 (1987). With all due respect to the Court of Appeals for the Ninth Circuit, whose opinion we have considered thoroughly, we decline to follow their opinion in *Price* (*Lawrence v. Commissioner,* 27 T.C. 713 (1957), revd. on other grounds 258 F.2d 562 (9th Cir. 1958)) except in those instances where appeal lies to that Court of Appeals (*Golsen v. Commissioner,* 54 T.C. at 756-757).

*Sonnenborn v. Commissioner,* 57 T.C. 373 (1971), was decided in the same year (1971) in which the innocent spouse provisions were enacted. At that time, with the legislative process still fresh, we sought to establish a proper perspective on the legislation, as follows (57 T.C. at 380-381):

It is important that these provisions be kept in proper perspective. The filing of a joint return is a highly valuable privilege to husband and wife since the resulting tax liability is generally substantially less than the combined taxes that would be due from both spouses if they had filed

separate returns. This circumstance gives particular emphasis to the statutory rule that liability with respect to tax is joint and several, regardless of the source of the income or of the fact that one spouse may be far less informed about the contents of the return than the other, for both spouses ordinarily benefit from the reduction in tax that ensues by reason of the joint return. However, some highly inequitable results were called to the attention of Congress, particularly where a wife had been divorced or separated or abandoned after the tax year, where she was saddled with a disproportionately high tax liability as a consequence of having filed a joint return, where such liability grew out of income attributable only to the husband, unknown to the wife, and where she had not enjoyed any benefit therefrom. It was in an effort to eliminate the unfairness of the joint and several liability provisions in such circumstances that section 6013(e) was enacted. To be sure, section 6013(e) is not limited to precisely such narrow situations. But it must be kept in mind that Congress still regards joint and several liability as an important adjunct to the privilege of filing joint returns, and that if there is to be any relaxation of that rule the taxpayer must comply with the carefully detailed conditions set forth in section 6013(e). We hold that petitioner has not brought herself within those provisions here. [Fn. ref. omitted.]

As we see it, the same perspective applies today; the benefits of joint tax return computations and tax rates are exchanged for the burdens of joint and several liabilities.[22] Petitioners, by filing a joint tax return, sought the benefits and accepted the burdens.[23]

With that perspective, we outline the considerations that lead us to decline to follow the Court of Appeals' opinion in *Price.*

*Firstly,* we note that the position that the Court of Appeals complains of is not the position only of the Tax Court. In *Purcell v. Commissioner,* 826 F.2d at 474, the Court of Appeals for the Sixth Circuit states as follows:

---

[22]For a brief history of the development of joint and several liability as "the price one must pay for the privilege of filing a joint return", see *Pesch v. Commissioner,* 78 T.C. 100, 129-130 (1982).

[23]Oddly, when the Congress provided to the innocent spouse relief from the burdens of the joint tax return, it did not remove from the "noninnocent spouse" the benefits of the joint tax return. Thus, if spouse A were to provide all the income subject to tax, if spouse B had only tax-exempt income (e.g., under sec. 103) and paid for substantial itemized deductible items (contributions, home mortgage interest, etc.) out of that exempt income and if B were relieved of all tax liability under the innocent spouse provisions, then A apparently would be allowed to retain the benefits of deducting B's expenditures against A's income as well as the benefits of joint tax return tax rates (rather than the rates applicable to married people filing separately).

Furthermore, the tax court's conclusion that her awareness of the tax consequences of this transaction was immaterial is correct. As the Seventh Circuit stated: "[t]he knowledge contemplated by [section 6013(e)] is not knowledge of the tax consequences of a transaction but rather knowledge of the transaction itself." *Quinn v. Commissioner,* 524 F.2d 617, 626 (7th Cir. 1975) (citation omitted). Thus, we believe that the court correctly concluded that appellant was not entitled to relief from the deficiency resulting from the income derived from the covenant not to compete. [Fn. ref. omitted.]

The *Purcell* opinion's quotation from *Quinn* appears in the course of an affirmance of the Tax Court's decision in *Purcell.* The *Quinn* language that is there quoted appears in the course of an affirmance of the Tax Court's decision in *Quinn* (62 T.C. 223 (1974)). The *Quinn* opinion, immediately following the language quoted in *Purcell,* cites the Tax Court's opinion in *McCoy v. Commissioner, supra.*

Also, as we have noted, *supra,* the Court of Appeals for the Eleventh Circuit (to which appeal lies in the instant case), in *Stevens v. Commissioner,* 872 F.2d at 1505 n. 8, states virtually the same thing, in a post-1984 Act innocent spouse deduction case, also relying on the same statement in *Quinn v. Commissioner, supra.*

Thus, at least two Courts of Appeals have seen fit to superimpose the pre-1984 Act income omission legal standards onto post-1984 Act deduction cases.

*Secondly,* we submit that the analysis of the Court of Appeals in *Price* practically writes out of the Code the following emphasized language in subparagraph (C) of section 6013(e)(1)(C):

(C) the other spouse establishes that in signing the return he or she *did not know,* and had no reason to know, that there was such substantial understatement, and * * * [Emphasis added.]

The definition of "understatement" (see secs. 6013(e)(3) and 6661(b)(2)(A))[24] is essentially the same as the definition of "underpayment" applicable to fraud (see secs. 6653(c)(1) and 6211(a)). If a taxpayer *knows* that the tax return under-

---

[24]In sec. 7721(c)(2) of the Omnibus Budget Reconciliation Act of 1989 (Pub. L. 101-239, 103 Stat. 2106, 2399), the Congress repealed sec. 6661. This repeal applies to tax returns which are required to be filed after Dec. 31, 1989, and so it does not affect the instant case. We suspect that the Congress intended to amend sec. 6013(e)(3) to replace the sec. 6661(b)(2)(A) cross-reference with a cross-reference to new sec. 6662(d)(2)(A), but that the change was inadvertently omitted from the 1989 Act.

states his or her tax liability by more than $500, and nevertheless signs that tax return, then this generally means that that taxpayer is committing fraud. Thus, under the Court of Appeals' analysis in *Price*, the putative innocent spouse merely has to prove an absence of fraud in order to win on the "did not know" portion of section 6013(e)(1)(C). Surely the Congress did not intend that the "did not know" requirement could be so easily satisfied as to make it superfluous. We should avoid such an interpretation of the statute. *Weinberger v. Hynson, Westcott & Dunning*, 412 U.S. 609, 633-634 (1973); *Fort Stewart Schools v. F.L.R.A.*, 860 F.2d 396, 403 (11th Cir. 1988); *Beisler v. Commissioner*, 814 F.2d 1304, 1307 (9th Cir. 1987), affg. a Memorandum Opinion of this Court.[25]

*Thirdly*, the Court of Appeals in *Price* contends that its analysis is mandated by the "plain meaning" of the statute. 887 F.2d at 963-964. The Court of Appeals for the Fifth Circuit confronted this problem in *Sanders v. United States*, 509 F.2d 162, 169 (5th Cir. 1975), as follows:

That is, the Tax Court apparently reads the statute to say that if a spouse knows or has reason to know of a transaction that the IRS later determines resulted in income to the couple, that spouse cannot claim the benefit of the innocent spouse provision even though he or she had no reason whatever to suspect that they had received taxable income.[14]

---

[14] This is perhaps a permissible reading of 6013(e)(1)(A)-(B) in light of Congress's general intent to extend relief only where equity demands it, but it is difficult to square with a literal reading of the statutory language. Subparagraph (B) mentions "such omission," which obviously refers back to (e)(1)(A) where omissions are described as "an amount *properly* included . . ." (emphasis added). Since the propriety of including a given sum can finally be determined only by the IRS or the courts, subparagraph (B) seemingly makes ignorance of the fact that known receipts constitute taxable income a valid justification for not knowing or having reason to know of omissions from gross income. Nevertheless, the practical problems that have always prevented acceptance of an ignorance of the law defense in the criminal law area, *see* W. LaFave & A. Scott, Handbook on Criminal Law 47, at 363-64 (1972), arguably apply just as forcefully here.

Evidently, the Court of Appeals for the Ninth Circuit also is uncomfortable with its plain meaning analysis, for it is

---

[25] T.C. Memo. 1985-25.

willing to conclude that "if a spouse knows virtually all of the facts pertaining to the transaction which underlies the substantial understatement, [then the spouse] * * * is considered *as a matter of law* to have reason to know of the substantial understatement" (887 F.2d at 964; emphasis added). We submit that the Court of Appeals for the Ninth Circuit has already departed from the plain meaning of the statute, and that, if the Court of Appeals' approach conflicts with that of the Tax Court, then it is only as to how much the putative innocent spouse must know of the underlying transaction before the putative innocent spouse is treated as knowing of the substantial understatement.

*Fourthly,* exemptions from taxation are to be construed narrowly. *Bingler v. Johnson,* 394 U.S. 741, 752 (1969); *Commissioner v. Jacobson,* 336 U.S. 28, 48-49 (1949); *Matthews v. Commissioner,* 92 T.C. 351, 361 (1989), on appeal (D.C. Cir., July 3, 1989).

*Fifthly,* we do not believe that our interpretation of section 6013(e)(1)(C) "would for the most part wipe out innocent spouse protection" in deduction cases, as the Court of Appeals charges. *Price v. Commissioner,* 887 F.2d at 963 n. 9. A brief effort at researching this matter has turned up the following recent Memorandum Opinions in which this Court held that the putative innocent spouse was entitled to innocent spouse tax benefits with respect to substantial understatements attributable to deduction, etc., items. *Bell v. Commissioner,* T.C. Memo. 1989-107; *McRae v. Commissioner,* T.C. Memo. 1988-374; *Bouskos v. Commissioner,* T.C. Memo. 1987-574; *Guth v. Commissioner,* T.C. Memo. 1987-522, on appeal (9th Cir., Jan. 11, 1988).

Finally, we note that, even if we were to follow the "plain meaning" of the statute, as stated by the Court of Appeals in *Price,* that would not change the result in the instant case and, we suspect, in many other cases, because of the impact of the *Price* rationale on the interpretation of section 6013(e)(1)(D).

It is clear that Margaret did not understand that Richard's basis in his Quinta stock could not properly be subtracted from Richard's Quinta dividend in determining petitioners' 1977 joint and several tax liability. This deduction (or "claim of * * * basis", within the meaning of sec.

6013(e)(2)(B)) had no basis in law, regardless of the dispute as to the amount of Richard's basis. However, it is equally clear that Richard also did not understand that his Quinta stock basis could not properly be subtracted from his Quinta dividend.[26]

If innocence of the correct tax consequences of the underlying transaction is all that is needed in order to satisfy the requirements of section 6013(e)(1)(C) (that the innocent spouse "did not know, and had no reason to know, that there was such substantial understatement"), then we would have to consider the requirement of section 6013(e)(1)(D) that "taking into account all the facts and circumstances, it is inequitable to hold [Margaret] liable for the deficiency in tax * * * attributable to such substantial understatement."

In *McCoy v. Commissioner*, 57 T.C. 732, 735 (1972), we stated as follows:

> Furthermore, if we look to the requirements of section 6013(e)(1)(C) [predecessor of present sec. 6013(e)(1)(D)], i.e., that taking into account all other facts and circumstances it is inequitable to hold the wife liable for the deficiency resulting from the omission of income, we find there is no inequity in this case. As we see it, the omission here resulted not from any concealment, overreaching, or any other wrongdoing on behalf of the husband, though we appreciate that the "innocent spouse" provisions do not specifically require wrongdoing in order to be brought into play. The omission resulted from a misapprehension of the income tax laws by the preparers of the tax returns and the signatory parties. Apparently neither the husband nor the wife knew the tax consequences of the forgiveness of indebtedness here involved. They were in this respect both "innocent spouses" and we perceive no inequity in holding them both to joint and separate liability.

We came to the same conclusion in our unanimous post-1984 opinion in *Lessinger v. Commissioner*, 85 T.C. 824, 838 (1985), revd. on other grounds 872 F.2d 519 (2d Cir. 1989).

Thus, a focus on the statutory language's literal requirement of knowledge of the substantial understatement (rather than knowledge of the underlying facts) would increase the likelihood that we would conclude that both spouses were innocent, in which event neither spouse

---

[26]We note that respondent has not determined or asserted the negligence addition to tax for 1977, even though petitioners' claim of basis had no basis in law.

apparently would qualify for innocent spouse status. *McCoy v. Commissioner,* 57 T.C. at 735.

Also, under section 6013(e)(1)(D), we would consider the question of Margaret's benefit. In the income omission cases, we have traditionally looked to whether the putative innocent spouse benefitted from the income that had been omitted. In a claim of basis case, such as the instant case, we might appropriately look to whether the putative spouse benefitted from the tax saving produced by the erroneous claim of basis. The tax saved by the erroneous claim of basis (adjustment of $969,428 out of adjustments totaling $1,124,664) clearly exceeded $400,000 (out of a total deficiency of $513,755.37). We have found that $417,205 of the net proceeds from the sale "were deposited into Richard's personal account" and "were used for petitioners' personal living expenses." We have also found that "Petitioners' living expenses were about $500,000 per year", that "Richard paid the household bills, and Margaret helped when he couldn't afford to pay the bills." A reasonable inference is that if Richard had paid the taxes promptly instead of taking the basis deduction, then he would not have had the $400,000 plus that he used to pay petitioners' living expenses, and so Margaret would have had to pay the shortfall. At any rate, petitioners have failed to carry their burden of proving the details of each petitioner's assets and expenditures from 1977 onward, as would be necessary in order to show that Margaret derived no significant benefit from the erroneous claim of basis. See our recent opinion in *Estate of Krock v. Commissioner,* 93 T.C. 672 (1989), for a discussion of the nature of the taxpayer's burden in such a situation.

We hold for respondent on this issue.[27]

To reflect the forgoing and the parties' settlement as to the amounts of the deficiencies (see note 3, *supra*),

---

[27]Petitioners objected to several of the stipulations on the basis of relevancy. At trial, we reserved our ruling on these objections. Since we have decided the controverted issues without considering these stipulations in our Findings of Fact and our Opinion, the admissibility of these stipulations has become moot.

> *Decision will be entered for the respondent for deficiencies as to 1977 and 1979 in the amounts stipulated to by the parties; and for the petitioners as to 1981.*

Reviewed by the Court.

NIMS, PARKER, SHIELDS, HAMBLEN, COHEN, CLAPP, SWIFT, JACOBS, and WRIGHT, *JJ.*, agree with the majority opinion.

PARR, *J.*, concurs in the result only.

GERBER, and RUWE, *JJ.*, did not participate in the consideration of this opinion.

---

SWIFT, *J.*, concurring: As the majority and dissenting opinions point out, certain language in some of the court opinions under section 6013(e)(1)(C) suggests the existence of a conflict or disagreement among the courts as to the proper description of the "knowledge" and "reason-to-know" tests of that section. As I read the opinions, however, I believe that the differences in the language used to describe the tests of section 6013(e)(1)(C) are more a matter of semantics than of substance.

The underlying factual analysis reflected in the various opinions generally is consistent. In *Stevens v. Commissioner*, 872 F.2d 1499, 1504 (11th Cir. 1989), affg. a Memorandum Opinion of this Court, in *Purcell v. Commissioner*, 826 F.2d 470, 473 (6th Cir. 1987), affg. 86 T.C. 228 (1986), and in other "deduction" and "omission" cases under section 6013, this Court and the Courts of Appeals typically analyze all of the facts and circumstances and base their holdings on whether the taxpayers knew or had reason to know of the *circumstances giving rise to* the understatements. The circumstances considered include more than mere knowledge of the underlying transactions. They include the size and significance of the transactions, the magnitude of the transactions vis-a-vis other items on the tax returns, and the participation of the taxpayers in and the benefits the taxpayers received from the transactions.

The Ninth Circuit's factual analysis in *Price v. Commissioner, supra,* is consistent with this approach, as follows:

we do not mean to say that a spouse's knowledge of the transaction underlying the deduction is irrelevant. Obviously, the more a spouse knows about a transaction, *ceteris paribus,* the more likely it is that [the spouse] will know or have reason to know that the deduction arising from that transaction may not be valid. We merely conclude that *standing by itself,* such knowledge does not preclude relief. [887 F.2d at 963 n. 9; emphasis added.]

The Eleventh Circuit has explained further, as follows:

The test establishes a "duty of inquiry" on the part of the alleged innocent spouse. Hence, the court's analysis must focus on whether the spouse had sufficient knowledge of the facts underlying the claimed deductions such that a reasonably prudent person in the taxpayer's position would question seriously whether the deductions were phony. * * * [*Stevens v. Commissioner,* 872 F.2d at 1505.]

Applying this analysis to the erroneous-basis deduction at issue in this case, the conclusion reached by the majority herein is fully supported by the facts. The size and significance of the transaction in which a major portion of the ranch was sold, the magnitude of the transaction vis-a-vis other items on the tax return, petitioner's familiarity with and the benefits she received from the ranch (having lived on the ranch every summer since the ranch was purchased in 1971), taken together with her specific knowledge of the sale of a portion of the ranch, support the conclusion that petitioner knew or had reason to know of the circumstances giving rise to the understatement relating to the erroneous-basis deduction. Accordingly, petitioner had a duty of inquiry, and petitioner's alleged deference to her husband's judgment and management of the family's financial matters does not qualify petitioner as an innocent spouse.

HAMBLEN, and JACOBS, *JJ.,* agree with this concurring opinion.

---

PARR, *J.,* concurring: I agree with the result reached in the majority's opinion, but I am concerned that we are *unnecessarily* creating a decisional conflict with the Ninth Circuit through our interpretation of section 6013(e)(1)(C). I would simply hold that Margaret Bokum has failed to meet her burden of proving that it would be inequitable to hold

her liable for the deficiency in tax. See sec. 6013(e)(1)(D). This holding would render the majority's expansive discussion with respect to the interpretation of section 6013(e)(1)(C) superfluous.

HAMBLEN, *J.*, agrees with this concurring opinion.

---

KÖRNER, *J.*, dissenting: I am in agreement with everything in the majority opinion except for one small part, involving the interpretation of section 6013(e)(1)(C), which requires that a putative innocent spouse establish "that in signing the return he or she did not know, and had no reason to know, that there was such substantial understatement * * * ." That small part, however, makes a major difference in the result here.

In holding in favor of respondent on this issue, the majority opinion in effect holds that a general knowledge of the transaction as a whole by the so-called innocent spouse will defeat the protection of the statute, even though it may be shown that the innocent spouse had no knowledge of nor had any reason to have knowledge that there was some element of the transaction as reported which gave rise to the substantial understatement.

In so doing, the majority here follows *Purcell v. Commissioner*, 86 T.C. 228 (1986), affd. 826 F.2d 470 (6th Cir. 1987) and the more recent opinion of *Stevens v. Commissioner*, 872 F.2d 1499 (11th Cir. 1989), affg. a Memorandum Opinion of this Court.

This same approach was taken by this Court in the case of *Price v. Commissioner*, an unreported case in 1988, on which we were reversed by the Court of Appeals for the Ninth Circuit in *Price v. Commissioner*, 887 F.2d 959 (9th Cir. 1989). In that case, the Ninth Circuit pointed out that section 6013 had been amended by the Tax Reform Act of 1984 because of the perception of Congress that it was phrased too narrowly. Thus, the purpose of the 1984 amendment was described in the House Report as follows:

The committee believes that the present law rules relieving innocent spouses from liability for tax on a joint return are not sufficiently broad to encompass many cases where the innocent spouse deserves relief.

\* \* \* \* \* \* \*

The bill liberalizes the innocent spouse joint return relief provision by expanding the circumstances in which the relief may be granted. [H. Rept. 432 (Part 2), 98th Cong., 2d Sess. 1501-1502 (1984).]

The Court of Appeals in *Price* (in note 9) made the following statements which I consider to be very significant in this case. The Court of Appeals said:

The tax court, borrowing language from cases involving deficiencies caused by omissions of income, read section 6013(e)(1)(C) to require a spouse to establish that she did not know of the *transaction* underlying the deduction. [Citations omitted.]

We decline to follow the tax court's literal super-imposition of the legal standard developed in omission cases onto deduction cases in part because to do so would for the most part wipe out innocent spouse protection in the latter category. Such a standard may be workable in omission cases simply because the understatement is caused by includable income being left off a return. Therefore, it is considerably easier for a spouse to show that she was unaware of the transaction giving rise to the omission, and thus to qualify for relief. [Citation omitted.] But because deductions are necessarily recorded, any spouse who at least reads the joint return will be put on notice that *some* transaction allegedly has occurred to give rise to the deduction. As a result, if knowledge of the transaction, operating of itself, were to bar relief, a spouse would be extremely hard-pressed ever to be able to satisfy the lack of actual and constructive knowledge element of section 6013(e)(1) in a deduction case.

Thus, adoption of such an interpretation would do violence to the intent Congress clearly expressed when it expanded coverage of the provision to include relief for spouses from deficiencies caused by deductions for which there is no basis in fact or law. [Citations omitted.] It would also hinder Congress's broader purpose in enacting section 6013(e)—that of seeking to remedy an injustice—by giving the section an unduly narrow and restrictive reading. [Citations omitted.]

While we do not embrace the tax court's construction of section 6013(e)(1)(C), we do not mean to say that a spouse's knowledge of the transaction underlying the deduction is irrelevant. Obviously, the more a spouse knows about a transaction, *ceteris paribus,* the more likely it is that she will know or have reason to know that the deduction arising from that transaction may not be valid. We merely conclude that standing by itself, such knowledge does not preclude relief.

In addition, when we look beyond the *language* courts have used in omission cases to the *function* such a standard has served, we see that it represents merely a different way of approaching what is the same inquiry as the one we announce today. [Citation omitted.] That is, in income omission cases, knowledge of the transaction is virtually equivalent to knowledge of the understatement because if a spouse knows of a transaction which generated income that the return does not report, then it is extremely likely that she will know that the return does not report

all income (unless she merely lacks knowledge of tax consequences). Thus, the omission cases that have examined whether a spouse had knowledge of the transaction in a sense really have been looking to discern whether she knew or had reason to know of the substantial understatement.

Here, the majority is saying in effect that simply because Mrs. Bokum knew about the sale of some of the Quinta Ranch property in a general fashion, she should be deemed to have knowledge, or be chargeable with knowledge, of the various computations which went into the way in which that transaction was reported in the return.

Specifically, the majority is holding that Mrs. Bokum was chargeable with the knowledge that as the transaction was reported in the 1977 return, an erroneous deduction was taken for the alleged stock basis of Mr. Bokum. Everyone agrees that such a claimed deduction had no basis in law and everyone agrees that it was this error which caused the deficiency in issue here as to which Mrs. Bokum claims relief. It also appears to be accepted by the majority that Mrs. Bokum was a person with no business or financial background, experience, or education, and that she had nothing to do with the operations of Quinta. I submit that to hold her liable in this situation simply requires that she underwrite the accuracy of the complicated computation by which the transaction was reported in the return—a transaction she was aware of in only the most general way and the details of which she knew nothing. I submit that this is exactly the type of situation which section 6013(e)(1)(C) was designed to meet, in order to provide protection to a truly innocent spouse who had nothing to do with the affair at all except for having signed the joint return.

The issue is a close one, and really depends upon the varying interpretation which the courts have given to section 6013(e)(1)(C) in *Purcell v. Commissioner, supra,* and *Stevens v. Commissioner, supra,* on the one hand, and in *Price v. Commissioner, supra,* on the other hand. The difference is a fine one, but the result is not. In this and similar cases, I think this Court should follow the lead of the Ninth Circuit in *Price* and give the statute the more liberal reading which Congress intended. Specifically, I think we should hold that Mrs. Bokum was an innocent spouse within the meaning of section 6013(e), so far as it

pertains to that portion of the deficiency herein which was attributable to the erroneous deduction of Mr. Bokum's claimed basis in the Quinta stock in arriving at the net amount reportable for tax purposes.

In other respects, I agree with the majority opinion.

WILLIAMS, WELLS, WHALEN, and COLVIN, *JJ.*, agree with this dissent.

---

WILLIAMS, *J.*, dissenting: I agree with Judge Körner's dissent and write only to add what I foresee as the regrettable implications of the majority's analysis.

The majority holds that solely because Mrs. Bokum knew of the transaction, she cannot be an innocent spouse (though the majority must itself resolve exactly what the transaction at issue is, see Majority Op. at 146). Specifically, the majority formulates the applicable legal standard as follows: "that the taxpayer claiming innocent spouse status must establish that he or she is *unaware of the circumstances* that give rise to the error on the tax return, and *not merely be unaware of the tax consequences.*" (Majority Op. at 145-146, emphasis added.) In articulating this standard the majority observes, without reference to any legislative history, that the "language changes made by the 1984 Act have not changed the old rule * * * ." Notably, however, the House Committee Report (H. Rept. 98-432, (Part 2) (1984), hereafter report) does refer to this issue in the "Reasons for Change" section explaining the proposed amendments to section 6013(e). The report provides as follows:

> The committee believes that the present law rules relieving innocent spouses from liability for tax on a joint return are not sufficiently broad to encompass many cases where the innocent spouse deserves relief. Relief may be desirable, for example, where one spouse claims phony business deductions in order to avoid paying tax and *the other spouse has no reason to know that the deductions are phony* * * * . [Report at 1502. Emphasis supplied.]

It is noteworthy that the Committee did not phrase the standard as the majority does (as whether the other spouse had reason to know about the deductions) but phrased the issue as whether the other spouse had reason to know that

the deductions were phony. The majority agree the claim of basis on the tax return was "phony" (majority op. at 144). The majority also agree that Mrs. Bokum had no reason to know that the claimed basis was phony (majority op. at 132). Despite these facts, the majority fails to accord Mrs. Bokum relief from tax liability on these phony claims she did not know about because Mrs. Bokum "knew or should have known of the circumstances that gave rise to the substantial understatement * * * ." (majority op. at 148). It is instructive to review the facts surrounding these circumstances giving rise to the phony basis claim: (1) Mrs. Bokum "did not participate in the business decision to sell, and did not know how much" was received in the sale (majority op. at 129), (2) Mrs. Bokum did not play "any role in the preparation of their 1977 joint tax return nor in the formulation of the tax treatment to be accorded the distribution on the tax return" (majority op. at 132), and (3) the tax return was presented to Mrs. Bokum for signature *after it had been prepared by accountants* (majority op. at 132). There is nothing on the return reporting the transaction at issue that would cause anyone to question the accountants' calculation of basis. The necessary implication of holding that Mrs. Bokum "should have known" is to require her to hire an independent tax adviser to review the return prepared by her husband's accountants. As the Supreme Court has stated in a slightly different context,

Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney. To require the taxpayer to challenge the attorney, to seek a "second opinion," or to try to monitor counsel on the provisions of the Code himself would nullify the very purpose of seeking the advice of a presumed expert in the first place. * * * [*United States v. Boyle,* 469 U.S. 241, 251 (1985).]

I believe that, as a matter of justice, such a burden is intolerable and that, as a matter of statutory interpretation, the majority's analysis contradicts the Congress' explicit attempt to (using the report's choice of words) "liberalize" (report at 1502) the relief afforded to people in Mrs. Bokum's circumstances.

KÖRNER, and WHALEN, *JJ.,* agree with this dissenting opinion.